Earle SMITH, et al., Plaintiffs,

v.

COBB COUNTY BOARD OF ELEC-
TIONS and Registrations, et al.,
Defendants.

Andy Perry, et al., Plaintiffs,

v.

Cobb County Board Of Elections and

Registrations, et al., Defendants,

v.

Mark A. Bell and David L. Wilkerson, Defendants–Intervenors.

No. CIV.A.1:02–CV–1093–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 20, 2002.

D. Glenn Brock, Carlton LaTain Kell, Ernest Linwood Gunn IV, Brock, Clay, Calhoun, Wilson & Rogers, Marietta, GA, for Plaintiffs.

Gregg Earl Litchfield, Harbert Scott Gregory, Jr., Haynie, Litchfield & Crane, Marietta, GA, for Defendants.

## ORDER

CARNES, District Judge.

The two above-captioned actions involve the reapportionment of electoral districts for the voters of Cobb County, Georgia. In each of these cases, the plaintiffs have asserted a claim based on an alleged violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, arising out of the failure of the Georgia General Assembly (hereinafter "the Legislature") to pass legislation re-drawing the electoral posts for the Cobb County Board of Education (hereinafter, "the Board") and the electoral districts for the Cobb County Commission (hereinafter, "the Commission"), respectively. The plaintiffs, who are individual Cobb County voters and members of the Board and the Commission, have filed these two related actions against the Cobb County Board of Elections and Registration to enjoin all future elections

of the Board and Commission under the current electoral districts, except for the election of the Chairman of the Commission, which is an "at-large" position elected by all citizens of Cobb County.

In an Order issued May 31, 2002, the Court declared the current districts for both the Board and the Commission unconstitutional, enjoined defendants from conducting future elections under that plan, and presented its own interim remedial plan for the upcoming election. Because of time constraints, the Court did not issue a full order explaining its legal conclusions with respect to the remedial plan. Accordingly, this Order sets out the Court's legal conclusions concerning the issuance of the remedial plan previously provided to the parties.[1]

## BACKGROUND

Cobb County, Georgia (the "County"), is one of 159 counties in Georgia and comprises a suburban area northwest of the city of Atlanta, including the municipalities of Smyrna, Marietta, Austell, Powder Springs, Kennesaw, and Acworth. For the purpose of electing five commissioners to serve on the County Commission, the County is divided geographically into four single-member electoral districts, with the fifth member of the Commission, the Chairman, elected on an at-large basis by all voters in the County. For the purpose of electing the seven members of the County School Board, the County is divided geographically into seven posts, excluding the City of Marietta, which maintains an independent school system separate from that of the County.

Following the 1990 Census, the geographical boundaries for the seven voting districts[2] for the School Board and the four voting districts for the Commission were re-drawn, and at that time, the districts represented populations of roughly equal size, as reflected in the 1990 Census figures. The 1990 Census data revealed that the County had a total population of 447,745 and, at the time the districts were drawn in 1992, the population for the four Commission districts ranged from a low of 108,501 in District 1 to a high of 115,246 in District 2. Similarly, the population of County had been distributed among the seven School Board posts on a roughly equal basis.

The 2000 Census, however, reflected a significant increase in the population of the County to a total of 607,751, and also reflected tremendous growth in the northwest part of the County, as compared with relatively stagnant growth in the east part, which is almost fully developed. It is undisputed that the current population figures for the County, as reflected in the 2000 Census, have resulted in gross disparities among the populations of the voting districts for both the Commission and the Board. (The 1992 plan for the Commission voting districts is attached hereto as Appendix A, and the 1992 plan for the School Board voting districts is attached hereto as Appendix F.) Under the current geographic boundaries for the four Commission districts, District One has a population of 191,889; District Two has 138,530; District Three has 130,053; and District Four has 147,279. (Plaintiffs' Hearing

---

1. This Order is issued in two separate, but related actions. The first case, *Smith v. Cobb County Board of Elections*, C.A. No. 1:02–CV–1093, N.D. Ga, involves the School Board posts and will be referred to herein as "the *Smith* case" or "the School Board case." The second case, *Perry v. Cobb County Board of Elections*, C.A. No. 1:02–CV–1206, N.D. Ga,

involves the County Commission districts and will be referred to herein as "the *Perry* case" or "the Commission case."

2. Although the members of the School Board are elected to "posts," for the purpose of convenience, the Court will sometimes refer to the separate posts as "districts."

Brief in the *Perry* action [12] at 8.) (*See* Table 1, *supra.*) Under the current boundaries for the School Board posts, Post One has a population of 115,152; Post Two has 73,792; Post Three has 81,798; Post Four has 73,760; Post Five has 64,321; Post Six has 62,699; and Post Seven has 78,408.[3] (*Smith* Compl., Ex. B.) (*See* Table 2.)

Table 1: Existing Commission Plan

| District | Population |
|---|---|
| 1 | 191,889 |
| 2 | 138,530 |
| 3 | 130,053 |
| 4 | 147,279 |

Table 2: Existing School Board Plan

| Post | Population |
|---|---|
| 1 | 115,152 |
| 2 | 73,792 |
| 3 | 81,798 |
| 4 | 73,760 |
| 5 | 64,321 |
| 6 | 62,699 |
| 7 | 78,408 |

As a result of these population disparities among the districts, in early 2002, legislation was proposed in the Georgia General Assembly[4] to create new boundaries for the voting districts for both the Board and the Commission that would better equalize the population distribution among the districts. Members of the Georgia House of Representatives from Cobb County, in consultation with members of the County Commission, introduced House Bill 1141 (HR 1141) to the House, which proposed to reapportion[5] the population of the County among new Commission Districts. (Ehrhart Aff. at ¶ 8.) HR 1141 was signed by a majority of the members of the delegation from the County in both houses, indicating their approval of the bill. (*Id.* at ¶ 9.) HR 1141 was then passed by a vote of the House of Representatives. The House also passed similar legislation that would have created new boundaries for the School Board posts, which had also been approved by the local delegation from the County. The *Perry* plaintiffs' proposed plan for the County Commission districts, which mirrors the plan passed by the local delegation and the State House, is attached hereto as Appendix B. The *Smith* plaintiffs' proposed plan for the School Board districts, which was approved by the same bodies, is attached hereto as Appendix G.

3. The sum of the populations for the seven School Board posts is less than that of the Commission Districts because the School Board Posts do not include the population of the City of Marietta, which, as noted above, maintains an independent school system. Furthermore, although the total population figures included in the various proposals for the School Board plans vary slightly from plan to plan, the Court's technical expert, Linda Meggers, has assured the Court that these variations are the result of technical errors in the proposed plans, and that the total population reflected in the Court's School Board plan, 549,003, is the correct number. (*See* Appendices F–I.)

4. The Georgia General Assembly is a bicameral body comprised of a House of Representatives, containing 180 seats, and a Senate, containing 56 seats. Ga. Const. Art. III, § 2, ¶ 1.

5. Technically, the term "reapportionment" refers to the redistribution of representatives among voting areas already established, whereas "redistricting" refers to the reformulation of the geographic boundaries of those voting areas. *Johnson v. Miller*, 929 F.Supp. 1529, 1534 n. 12 (S.D.Ga.1996). The two terms are frequently used interchangeably in voting rights cases, however, and although the instant actions are concerned with redistricting, and not actually reapportionment, the two terms will be used interchangeably herein to refer to the act of creating new geographic boundaries for the voting districts of Cobb County.

Ordinarily, when "local legislation" has received the requisite number of signatures of representatives and senators whose districts lie within the locality that is affected by the legislation, the House and Senate pass the bill as a matter of local courtesy.[6] *See DeJulio v. Georgia,* 290 F.3d 1291, 1292–94 (11th Cir.2002). As the Eleventh Circuit has recognized:

> The underlying assumption of local courtesy is that the bill affects only a certain city or county, and, therefore, representatives and senators of other districts should defer to that local delegation's judgment. Local courtesy is a custom, however, and is not provided for in either the House or Senate rules. Should a member of the House or Senate choose to challenge local legislation on the floor, local courtesy is not enforced.

*Id.* at 1294.

Although the proposed plans for the new voting districts were approved by the local delegation and passed by the House, the plans were never sent to the State Senate for its approval. Rather, as the Senate Reapportionment Committee refused to allow the plans out of committee to be voted on by the Senate, the State Senate was never in a position to review or approve these plans. Accordingly, the 2002 Session of the Georgia General Assembly expired with the proposed redistricting plans still languishing in a committee of the State Senate. No special session is scheduled for the Legislature to convene at any time before the next election, which is set to be held on August 20, 2002; indeed, the Legislature is not scheduled to reconvene until January, 2003. (Intervenors' Ex. 2; Ehrhart Aff. at ¶ 11.)

Thus, because the Legislature failed to approve the proposed new plans for the voting districts for the Cobb County Commission or School Board, the 1992 districts are still in effect for the voters of Cobb County. Furthermore, all the parties agree that neither the School Board nor the Commission has the legislative authority to act independently of the Georgia Legislature to create new voting districts. Accordingly, the School Board and the Commission are without any authority to change the boundaries of the existing districts before the upcoming election.

On April 23, 2002, Earle Smith, a resident of Cobb County and a voter in the Cobb County School District, along with Curt Johnston, Laura Searcy, Johnny Johnson, Lindsey Tippins, Teresa Plenge, Betty Gray, and Gordon O'Neill, who are all current members of the Cobb County Board of Education as well as voters in the Cobb County School District (collectively, the *"Smith* plaintiffs"), filed a Complaint for Declaratory and Injunctive Relief against the Cobb County Board of Elections and Registrations and its members, as well as the Director of Elections, Sharon Wingfield, in their official capacities. The *Smith* plaintiffs brought a claim pursuant to Article 4, Section 2 and the Fourteenth Amendment of the Constitution, and under 42 U.S.C. §§ 1983 and 1988, alleging that their rights under the Equal Protection Clause of the Fourteenth Amendment would be violated if an election were to be held under the current voting districts for the School Board. The plaintiffs also brought a claim under the

---

**6.** "Local legislation" is legislation presented in the Georgia General Assembly that applies only to a specific city, county, or special district. *DeJulio v. Georgia,* 290 F.3d 1291, 2002 WL 924172 at *1 (11th Cir. May 8, 2002). It comprises a large part of the bills introduced and enacted by the Legislature each year and, because of this volume, both the House and Senate have adopted local delegations for the consideration of local legislation. *Id.* Each county and municipality has a local delegation that is comprised of every legislator whose district encompasses territory within that county or municipality. *Id.*

Georgia Constitution, pursuant to Article 1, Section 1, Paragraph 2.

The School Board plaintiffs argue that the current voting districts violate the constitutional principle of "one-person, one-vote," and they allege that, if the School Board election were to be held under the current voting districts, their rights and the rights of all Cobb County voters to have equal participation in the electoral process would be violated. In particular, the plaintiffs allege that the voting strength of the voters in Post One would be severely diluted, whereas the voting strength of voters in Posts Five and Six would be disproportionate to the population in those districts. As a remedy for the allegedly unconstitutional voting districts, the *Smith* plaintiffs seek declaratory and injunctive relief. Specifically, they seek a declaration by the Court that the current boundaries for the School Board voting districts are unconstitutional because they violate the principle of "one-person, one-vote." They further seek an injunction prohibiting the Board of Elections from holding any future elections under the current voting districts until either this Court or the Georgia General Assembly enacts the alternative districting plan that has been proposed by the Cobb County Board of Education, which the plaintiffs contend is consistent with the requirements of the Constitution. Finally, the *Smith* plaintiffs seek an award of costs and attorney's fees.

On May 6, 2002, a separate Complaint was filed in this Court by Andy Perry and Randall Bedgood, residents of Cobb County who vote in District One for the County Commission under the current district boundaries, as well as William J. Byrne, Billy L. Askea, Joe L. Thompson, Samuel S. Olens, and George Woody Thompson, who are voters in Cobb County and current members of the County Commission (collectively, the *"Perry* plaintiffs"). The *Perry* plaintiffs have also brought claims under the Fourteenth Amendment and the Georgia Constitution for a violation of their right to Equal Protection under the laws and unlawful dilution of their voting strength in the elections for the County Commission. As in the *Smith* case, the *Perry* Complaint seeks Declaratory and Injunctive Relief against the Cobb County Board of Elections and Registrations and its members, and requests that the Court declare the current Commission voting districts unconstitutional and enter an Order that creates new geographic boundaries for the districts in accordance with the plan proposed in HR 1141 and passed by the Georgia House of Representatives. (*See Perry* Compl., Attachment A.)

The defendants timely filed Answers in both actions. Although they do not challenge the plaintiffs' allegations that the current voting districts for either the Board or the Commission are unconstitutional under the current geographic boundaries, the defendants state that they have not violated any provision of the State or Federal Constitution or any other law, and contend that it is the sole obligation and duty of the Georgia Legislature to reapportion the County voting districts. (*See* Answer in *Perry* case [7] at 2.) Furthermore, defendants state that the Board of Elections is without the power to postpone, modify or stop the election because the voting districts are not apportioned correctly. (*Id.*) Defendants seek relief from the Court in determining whether the elections should be held under the current schedule, as required by state and federal law, and should the Court determine that the current voting districts are unconstitutional, defendants request an Order from the Court setting an alternative schedule for the upcoming elections that "minimizes the confusion, delay and expense to the voters of Cobb County." (*Id.* at 9.)

On May 8, 2002, the parties in both actions filed Joint Motions for an Expedited Scheduling Conference, seeking an expedited hearing before the Court to determine whether elections should proceed under the current schedule. The parties indicated in their joint motions that the qualifying period for the upcoming elections was set for June 19–21, 2002, with the primary elections scheduled for August 20, 2002. The parties jointly represented to the Court that a new districting plan that complied with constitutional requirements was required to be in place by May 17, 2002, in order to avoid any disruption to the statutory schedule for the qualifying period and election for the School Board and the Commission. On the basis of the parties' representations, the Court held a brief conference on May 10, 2002. At that conference, the defendants indicated that the election would be able to proceed under the statutory time period if a new districting plan were in place by May 31, 2002. The defendants represented to the Court that if a new districting plan were not in place on or before that date, however, the Board of Elections would not have enough time to implement a new plan prior to the upcoming election, because of statutory time constraints. Further, if the scheduled election were delayed, a special election would be required at an estimated expense of $2 million to the taxpayers of Cobb County. The defendants also indicated to the Court that they did not oppose the districting plans proposed by the plaintiffs, which were the plans that had been approved by the Cobb County delegation and passed by the House of Representatives.

In light of this "drop-dead" date of May 31, 2002 for a ruling on the proposed plans, the Court scheduled an evidentiary hearing in both actions for May 24, 2002. Just three days before the hearing was scheduled to take place, on May 21, 2002, David L. Wilkerson and Mark A. Bell filed motions to intervene as defendants in both the *Smith* and *Perry* actions; also the Georgia Democratic Party filed motions in both cases to appear as an *amicus curiae*. Although the Commission did not object to the parties' intervention in the *Perry* case, the School Board did object to intervention in the *Smith* case. Because of the extreme time constraints, however, the Court did not have an opportunity to rule on the motions to intervene before the hearing scheduled for May 24, 2002. At that hearing, it granted the movants' request to intervene in the Commission case. Although the Court reserved ruling on the motions to intervene in the School Board case, it allowed the putative intervenors to participate fully in the hearing and oral argument held on that date, just as if they had been granted intervenor status. Further, the Court allowed intervenors and the putative intervenors[7] to present proposed redistricting plans for both the Board and the Commission and to present arguments in favor of their proposed plans and against the plaintiffs' proposed plans. (The *Perry* intervenors' proposed plan for the County Commission districts is attached hereto as Appendix C; the *Smith* intervenors' proposed plan for the School Board districts is attached hereto as Appendix H.)

After considering the arguments and evidence presented by all the parties and intervenors during the hearing on May 24, 2002, the Court issued an Order on May 31, 2002, declaring the current districting plans for the Commission and the School Board unconstitutional, and establishing an interim remedial redistricting plan that

---

**7.** From hereon out, when the Court uses the term "intervenors," it is referring to both the Perry intervenors and the Smith putative intervenors, unless otherwise indicated.

would be in effect solely for the next election. All references to the "Court's Plan" herein are to the districting plans previously issued by Order of this Court on May 31, 2002. (The Court's plan for the County Commission districts is attached hereto as Appendix D, and the Court's plan for the School Board districts is attached hereto as Appendix I.)

## DISCUSSION

### I. The 1990 Districts Violate the One–Person, One–Vote Principle and Are Unconstitutional

No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

Wesberry v. Sanders, 376 U.S. 1, 17–18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

The plaintiffs in both actions have asserted a claim under the Equal Protection Clause of the Fourteenth Amendment, arguing that their constitutional right to vote will be infringed if the County elections are held pursuant to the geographic boundaries of the existing districts. It is a fundamental constitutional principle that each citizen's vote must be given the same weight as every other citizen's vote in state and national elections. See Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

Id. at 555, 84 S.Ct. 1362.

In light of this fundamental principle, the Supreme Court held in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), that the Fourteenth Amendment's guarantee of equal protection under the law requires that states ensure that every citizen's vote is given equal weight to that of every other citizen in elections for state legislators. This ruling has become known as the "one-person, one-vote" principle.

Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system.

Id. at 562, 84 S.Ct. 1362.

The Court later extended the principle of "one-person, one-vote" to elections for county and local government officials. Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). Under the Equal Protection Clause of the Fourteenth Amendment, states and local governments must provide each qualified voter with an equal opportunity to participate in any election in which persons are selected by popular vote to perform governmental functions. Hadley v. Junior College Dist., 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). In order to ensure that all votes are given equal weight, when members of an elected body are chosen by popular vote from separate districts, each district must be established so that equal numbers of voters can vote for proportionally equal numbers of officials. Id. Thus,

because the County Commissioners and members of the School Board are elected by the people of Cobb County to perform governmental functions, the Fourteenth Amendment requires the State of Georgia to establish voting districts for both the Commission and the Board that have substantially equal numbers of voters in each district in order to comply with the "one-person, one-vote" principle.

 In the instant action, it is undisputed that the geographic boundaries for the existing districts are not drawn so that equal numbers of voters will be voting for a proportionally equal number of officials. Instead, the results of the 2000 Census indicate that there are significant disparities in the populations for the four Commission districts and the seven School Board posts.[8] With respect to the four Commission districts, the population varies from a high of 191,889 in District One to a low of 130,053 in District Three. With respect to the seven School Board posts, the population varies from a high of 115,152 in Post One to a low of 62,699 in Post Six. All the parties in this action agree that these substantial differences in the populations of the Commission and School Board districts under the 1992 plan violate the principle of "one-person, one-vote."

Specifically, the 2000 Census revealed that the total population of Cobb County in 2000 was 607,751. Apportionment plans are evaluated under the one-person, one-vote principle by determining the amount by which the population in each district deviates from the size of the ideal district, and by determining the overall deviation between the two districts with the greatest disparity in population. *See Abrams v. Johnson,* 521 U.S. 74, 98, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997). Accordingly, by using that number and dividing by four, an "ideal district size" for the four Commis-

sion voting districts that would result in nearly perfect equality among the populations would be 151,938. Under the current geographic boundaries for the four Commission districts, District One has a population of 191,889; District Two has 138,530; District Three has 130,053; and District Four has 147,279. Thus, District One deviates from the ideal district by 26.29%, District Two by −8.82%, District Three by −14.40%, and District Four by −3.07%, and the overall or total deviation of the Commission districts under the 1992 plan is 40.70%.

Under the 1992 geographic boundaries for the School Board posts, Post One has a population of 115,152; Post Two has 73,792; Post Three has 81,798; Post Four has 73,760; Post Five has 64,321; Post Six has 62,699; and Post Seven has 78,408. Based on an ideal district size of 78,429, Post One has a deviation of 46.58%, Post Two has a deviation of −6.07%, Post Three has a deviation of 4.12%, Post Four has a deviation of −6.11%, Post Five has a deviation of −18.13%, Post Six has a deviation of −20.19%, and Post Seven has a deviation of −0.19%. The total deviation of the School Board districts under the 1992 plan is thus 66.77%.

Although the Supreme Court has not established an absolute "cut-off" for the maximum overall deviation that an apportionment plan may have before it violates the Fourteenth Amendment, the Court has held that any deviation in state legislative apportionment plans smaller than 10% overall is considered *de minimis* and is thus consistent with the requirements of the constitution; any deviation greater than 10%, however, must be justified by the state on the grounds that the deviation is necessary to further rational state policies, such as preserving the integrity of political subdivision lines. *See Voinovich*

---

8. *See* Tables 1 and 2, *supra.*

*v. Quilter,* 507 U.S. 146, 161, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993); *Brown v. Thomson,* 462 U.S. 835, 842–843, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *Connor v. Finch,* 431 U.S. 407, 418, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977).

> [M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State. Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State.

*Brown,* 462 U.S. at 842–842, 103 S.Ct. 2690; *see also Voinovich,* 507 U.S. at 161, 113 S.Ct. 1149.

Under the existing plan, the overall deviations of 40.70% for the Commission districts and 66.77% for the School Board districts far exceed a deviation of 10% and no party has advanced any argument that these significant deviations are justified by any furtherance of rational state policies. Instead, the parties agree that the deviations in the plans violate the one-person, one-vote principle under the Fourteenth Amendment. Thus, the Court declares the current districting plans for the Cobb County Commission and the School Board unconstitutional and new geographic boundaries must be drawn in order to remedy the current disparities in population among the districts.

■ The Supreme Court has repeatedly emphasized that it is the duty and responsibility of the State to determine the apportionment of electoral districts within its borders. *See Voinovich,* 507 U.S. at 156, 113 S.Ct. 1149; *Growe v. Emison,* 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388

(1993); *Upham v. Seamon,* 456 U.S. 37, 41, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). Federal courts are not allowed to intervene in state apportionment matters in the absence of a violation of federal law. *Voinovich,* 507 U.S. at 156, 113 S.Ct. 1149. Because the current boundaries for the voting districts in Cobb County violate the plaintiffs' constitutional rights, however, and because the Georgia Senate has refused to fulfill its responsibility to create new voting districts that comply with federal law, the Court must intervene to remedy the constitutional violations.

> [O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid.

*Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (emphasis added).

The Court concludes that neither of the two pending actions presents "the unusual case" in which the Court would be justified in failing to take appropriate action to remedy the constitutional violations of the current apportionment plan. In fashioning a remedial plan, however, the Court has been mindful of the Supreme Court's direction that courts should "reasonably endeavor to avoid a disruption of the election process which might result from requiring

precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." *Id.*

The Court now turns its attention to the proposed plans presented by the parties and to the plans ultimately created by the Court.

## II. *The Perry Case (County Commission Districts)*

As noted above, the existing 1992 plan for the voting districts for the Cobb County Board of Commissioners is unconstitutional because it violates the fundamental principle of one-person, one-vote. The plaintiffs in the *Perry* case argue that the Court should adopt the plan devised by the local Cobb Legislature delegations after consultation with the County Commission, which plan was passed by the Georgia House of Representatives. They have submitted that plan to the Court. (See Appendix B.) The intervenors object to the plaintiffs' proposed plan on the ground that the plaintiffs' plan allegedly violates Section 5 of the Voting Rights Act of 1965, 42 U.S.C. §§ 1973 *et seq.* (hereinafter the "VRA"). The intervenors have submitted an alternative plan that they have asked the Court to adopt. (See Appendix C.) The Court has reviewed and considered the plans submitted by both the plaintiffs and intervenors, and has devised its own remedial plan to comply with the requirements of the Constitution and the VRA.

### A. *Plaintiffs' Proposed Plan*

In order to remedy the obvious constitutional violations inherent in the existing voting districts for the Cobb County Commission, in early 2002, the members of the Commission participated in drafting a new plan to present to the Georgia Legislature that would better equalize the population among the four districts. As noted, the plan had the approval of the majority of the members of the local delegation from Cobb County and it passed the House of Representatives as HR 1141. Because the Senate committee to which the plans were initially sent refused to allow the plans out of committee to be voted on by the entire Senate, however, the Senate was never even given an opportunity to vote on the plan.[9]

The *Perry* plaintiffs have asked the Court to adopt the plan proposed in HR 1141 as the Court's plan for the voting districts of the Cobb County Commission. They argue that the plan remedies the constitutional violations of the 1992 plan and complies with the one-person, one-vote principle of the Fourteenth Amendment. They also contend that the proposed plan

---

**9.** Senator Ehrhart indicated in his affidavit that, because a majority of the members of the Cobb delegation had approved the legislation, the bill should have passed onto the floor of the Senate for a floor vote. Indeed, Senator Ehrhart indicated that the refusal of the Senate Reapportionment Committee to release the bill was in contravention of the local delegation rule. Senator Ehrhart further proffered that this refusal was "highly unusual" and that he was not aware of such an action having ever occurred prior to this incident. (Ehrhart Aff. at ¶¶ 9–10.)

As to the last statement, counsel for the Democratic Party and intervenors objected because Senator Ehrhart was not present to be cross-examined on this point. Accordingly, the Court cannot conclude that this type of conduct has never occurred before. At any rate, Senator Ehrhart's proffered testimony, combined with the amicus' failure to show that such has ever occurred before, strongly suggests that the action of the Senate Reapportionment Committee with regard to the Cobb local legislation was, at the least, highly unconventional. Further, as noted *infra* at 1290–1291, while time constraints have prevented the Court from exploring the ramifications of the Senate Committee's obvious efforts to thwart passage of a reapportionment bill for Cobb County, this court will address

complies with all requirements of the VRA, including Sections 2 and 5. They further argue that the plan reflects the legislative policies of the Cobb County Commission, whose members have been elected by the voters of Cobb County, and thus, the Court should defer to those policies and adopt their plan.

Under the plaintiffs' proposed plan (Appendix B), District One has a deviation of −0.85%, District Two 0.48%, District Three 1.33%, and District Four −0.96%, with a total overall deviation of 2.28%. Thus, the plaintiffs' proposed plan remedies the large population deviations in the existing plan, and the Court finds that it is well within the maximum 10% population deviation ordinarily allowed for legislative plans under the one-person, one-vote standard.

### B. *Intervenors' Proposed Plan and Objections To Plaintiffs' Plan*

The intervenors are two African–American voters who reside in District Four. The Amicus Democratic Party supports their position. The intervenors' proposed plan for the County Commission districts is attached hereto as Appendix C. Under the intervenors' proposed plan, District One has a deviation of 0.81%, District Two a deviation of −0.58%, District Three a deviation of 0.72%, and District Four a deviation of −0.95%, with a total overall deviation of 1.77%. Thus, like the plaintiffs' proposed plan, the intervenors' proposed plan remedies the large population deviations in the existing plan, and the Court finds that it is well within the maximum 10% population deviation ordinarily allowed for legislative plans under the one-person, one-vote standard.[10]

Although the intervenors argue that their plan better achieves population equality than does the plaintiffs' plan, their real objection to the latter's plan is its alleged failure to comply with Section 5 of the Voting Rights Act. Noting that § 5 has been interpreted to prohibit retrogression in existing minority strength, the intervenors contend that, as to District Four, the plaintiffs' plan does "retrogress," whereas their plan does not. Specifically, intervenors note that under the existing plan, the black voting age population (BVAP) in District Four is approximately 31%. Under the plaintiffs' proposed plan, the BVAP in that district is 24%, whereas, under the intervenors' plan, the BVAP is approximately 30.5%. Intervenors contend that their small diminution of BVAP does not constitute retrogression, whereas plaintiff's 7% decrease does.

In addition to arguing the existence of retrogression in the plaintiffs' plan, intervenors also argue that the Court is not permitted to adopt as its plan the plaintiffs' plan. Intervenors note that § 5 requires that any plan adopted by a legislative group be precleared by the Department of Justice or the D.C. District Court. According to intervenors, while this Court may avoid these preclearance requirements if it creates its own remedial plan, the Court will trigger the need for preclearance—which could not be accomplished in time for

---

that matter if a full trial is needed on this matter.

**10.** The Court notes that the intervenors' plan has never been approved by the County Commission, the Georgia Legislature, or any other legislative body, and thus, is not actually a "legislative plan" to which the 10% deviation standard would apply. The Court only notes that the plan is within the 10% deviation limit that the Supreme Court has held is *prima*

*facie* consistent with constitutional standards for legislative plans. Court-ordered apportionment plans, however, are held to even stricter standards of population equality than legislative plans, and thus, courts should strive for overall population deviations even smaller than 10%. *See Connor v. Finch,* 431 U.S. 407, 414–415, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Chapman v. Meier,* 420 U.S. 1, 26–27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

the upcoming elections—if it merely rubber stamps the plaintiffs' plan.

Further, intervenors argue that, pre-clearance concerns aside, this Court should not defer to the plan promulgated by plaintiffs because, although it was approved by the local delegation and State House, it was never passed by the Senate and thus is not entitled to deference as a legislative plan. Instead, intervenors argue that this Court should give deference to the last legislative enactment concerning Cobb Commission districts, which is the 1992 Plan. As the Court obviously cannot give complete deference to that plan, because it contains unconstitutional population deviations between districts, intervenors argue that the Court should use that plan as a starting point and make only "minimal changes" to the plan, sufficient to even out population deviations. In this same vein, intervenors contend that their own plan comports with the "minimal change" guidepost more than does that of the plaintiffs.

## C. Deference to Legislative Plans, Generally, and The "Minimum Change" Construct

■ Both the plaintiffs and intervenors appear to agree that this Court is required to give deference to the State's legislative policies when it drafts a remedial plan. They disagree, however, about which plan—the 1992 Plan or the 2002 Plan—best reflects those policies and, hence, which of these plans deserves the most deference from this Court. Leaving aside for the moment an analysis of the impact of Section 5 on this litigation, the Court turns first to the questions of what deference generally a court should pay to a legislative plan, which legislative plan should this Court be looking at, and the applicability of the "minimal change" construct in this particular case.

## 1. Must Deference Be Given to the Plaintiffs' Plan?

■ As noted, the plaintiffs have argued that their proposed plan, which was recently devised and approved by the elected members of the local Cobb legislative delegation, in consultation with members of the County Commission, reflects the current legislative policies of the State and the Commission and is entitled to deference from this Court, even though it was never formally enacted by the entire legislature during the 2002 session. Intervenors counter, among other things, that the failure of the legislature to enact the plan is fatal to plaintiffs' argument that its proposed plan is entitled to deference.

Plaintiffs' contention arguably finds some support in *Tallahassee Branch of NAACP v. Leon County, Fla.*, 827 F.2d 1436 (11th Cir.1987), in which the Eleventh Circuit gave deference to a proposal by a county commission that had not been enacted into law. In *Leon County*, black voters had challenged the at-large election system as a violation of the prohibition against dilution of minority voting rights, under § 2 of the VRA. Apparently believing that the plaintiffs had a good case, the defendant commissioners obtained a continuance of the trial in order to submit, to a referendum vote, a new plan that provided for a mixed system including some single member districts and some at large seats. Under Florida law, the commissioners could apparently propose such a plan, but they had no power to implement the plan; instead, such a change could not be effected without the approval of the electorate through a referendum. The voters rejected the change, however. Admitting liability in the case—that is, that an all at-large system violated § 2—the commissioners proceeded again to draft a plan that consisted of some single member and some at large member districts. This

time, however, the commissioners did not put the plan to a vote, but instead presented it to the court as a proposed remedial plan. *Id.*, 827 F.2d at 1437.

Even though the commission clearly lacked authority to implement such a change on its own, the court adopted the commission's plan as its own, determining that the plan was "legislatively enacted" and therefore "entitled to the deference normally afforded legislative judgment in apportionment matters." 827 F.2d at 1437–38. This characterization of the plan as legislative by the court was pivotal, in that a judicial remedial plan should typically include only single member districts, whereas a legislative plan was not restricted to single member districts. *Id.*

On appeal, the Eleventh Circuit concurred with the district court's conclusion that the proposed plan was legislatively enacted and entitled to deference, even though the commission had no power to implement its plan without the consent of the electorate. *Id.* at 1440 ("a broad definition of 'legislatively enacted' leaves reapportionment to be performed by a legislative body of the state rather than the federal judiciary"); *see also McDaniel v. Sanchez*, 452 U.S. 130, 153, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981) ("the essential characteristic of a legislative plan is the exercise of legislative judgment"); *Wise v. Lipscomb*, 437 U.S. 535, 548, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978) ("[T]he plan proposed by the Dallas City Council in this case must be considered legislative, even if the council had no power to reapportion itself.... The essential point is that the Dallas City Council exercised a legislative judgment, reflecting the policy choices of the elected representatives of the people,

rather than the remedial directive of a federal court.") (Powell, J., concurring).

As Judge Evans points out in her recent order in the Fulton County redistricting case, *Bodker v. Taylor,* C.A. No. 1:02–CV–0999–ODE, N.D.Ga. (Order dated June 5, 2002) (hereinafter *"Bodker"*), the *Leon County* case can be distinguished on its facts because, under Florida law, the county commission had the authority to create its own reapportionment scheme, subject to approval by a referendum submitted to the voters, whereas in Georgia, only the legislature has the authority to approve reapportionment plans for counties. *See Leon County,* 827 F.2d at 1437–1438. Thus, Judge Evans held that the plan proposed by the Fulton County Commission was not entitled to deference as a legislatively enacted plan because it was not created or approved by the Georgia General Assembly: the only body with the authority to do so.[11] *Bodker,* at 6–11.

Moreover, as will be explained *infra* in the section of this Order discussing preclearance requirements under § 5 of the VRA, a determination that the plaintiffs' plan was legislatively enacted only serves to bolster intervenors' argument that the plan must be precleared by the Department of Justice. Thus, to the extent that plaintiffs advance their argument as a result of *Leon County,* they are forced to retreat back in the face of § 5's preclearance requirements.[12] Because, as discussed *infra,* this Court cannot promulgate as its own the plaintiffs' plan, without first preclearing that plan, the Court does not have to decide here whether it could defer to that plan if preclearance were not an obstacle. If the legislature fails again to

---

**11.** As in the *Perry* case, the Fulton County Commission's reapportionment plan was passed by the House of Representatives, but was never put to a vote by the Senate. (*See* Order in *Bodker,* at 2.)

**12.** Indeed, it is not clear how the commissioners and district court in *Leon County* cleared the § 5 preclearance hurdle.

reapportion the Cobb County Commission, the Court will convene a trial next summer to determine a final plan. In that event, there will be ample time to have the Court's plan precleared by DOJ. At that juncture, the question whether the Court can properly defer to the plan proposed by the Commission and/or the local delegation will be ripe.

Even if the Court cannot defer—that is, adopt *in toto*—a proposed, but unenacted, plan by the commission, this fact does not mean that the Court cannot consider the plan. Indeed, in the face of arguments that she could not defer to the Commission plan because it was not a legislative enactment and had not been precleared, Judge Evans explained the similarity of her plan to the Commission's proposal by noting that even though the proposed plan may not have been entitled to deference as a legislatively enacted plan, it was still entitled to some consideration as an expression of county policy. *See Bodker* at 12; *see also White v. Weiser,* 412 U.S. at 796–797, 93 S.Ct. 2348. Likewise, in this case, the plaintiffs' proposed plan represents the only *current* expression of governmental policy as to the appropriate redistricting of Cobb County.[13] Accordingly, the Court concludes that it may properly consider the plaintiffs' proposed plan, even though the Court cannot defer to that plan because of § 5 considerations. *See infra.*

## 2. *The 1992 Plan and the Minimal Change Construct*

Intervenors argue that the 1992 plan represents the only expression of legislative policy regarding the districting of Cobb County and that, in fashioning a remedial plan, the Court must take that 1992 plan and make only minimal changes to it to arrive at its own plan. In support of its "minimal change" argument, intervenors cite *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). In *Upham,* the Supreme Court stated:

> Whenever a district court is faced with entering an interim reapportionment order that will allow elections to go forward it is faced with the problem of "reconciling the requirements of the Constitution with the goals of state political policy." An appropriate reconciliation of these two goals can only be reached if the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect.

*Upham v. Seamon,* 456 U.S. 37, 43, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). Intervenors' argument on this point is not merely an objection to the plaintiffs' proposed plan, but is also an argument regarding the limits of the Court's discretion to fashion its own plan. In sum, the intervenors argue that the 1992 plan is the only plan before the Court that reflects legitimate state policies, because it is the last

---

**13.** This is not a case in which the legislature could not come to an agreement and therefore failed to adopt a redistricting plan. In fact, the House of Representatives had already adopted the proposed local plan. Moreover, the Senate did not reject the plan; instead, as a result of apparent political machinations, the bill was held up in a Senate committee. *See* discussion *supra* at 1280–1281. Although the record has not been fully developed, one can reasonably infer that the person or persons who opposed the redistrict-ing plan felt it unlikely that the full Senate would reject that plan; otherwise, they would not have caused it to be held hostage in a committee, but instead would have sent it out for a vote. Thus, one can also reasonably infer that, but for an apparently successful effort to keep the bill from being voted on, the entire Senate would have considered and passed the redistricting bill. Then, intervenors or any other interested party would have been free to file objections with the Department of Justice during the normal preclearance process.

plan approved by the Georgia Legislature and precleared by the Attorney General. Further, intervenors have repeatedly argued that, pursuant to *Upham v. Seamon,* this Court can make only minimal changes to the existing 1992 plan to even out the population deviations.

Because of the severe time constraints facing it, the Court has, in fact, created a plan that largely comports with intervenors' notion of minimal change; indeed, the Court's plan arguably achieves minimal change better than does that of the intervenors. Yet, because the Court may again see this case in a posture in which the Court is not as pressed for time, the Court wishes to make clear that its current interim plan should not be construed as an indication that the Court necessarily feels bound to make only minimal changes to the 1992 plan. In fact, intervenors are much more enthusiastic about the applicability of *Upham* to this case, than is the Court. To the contrary, *Upham* is distinguishable on its facts from this case. In *Upham,* the district court was faced with a reapportionment plan for the Texas congressional delegation that had been recently approved by the Texas legislature prior to being submitted to the Attorney General for preclearance under Section 5 of the VRA. *Upham,* 456 U.S. at 38, 102 S.Ct. 1518. Although the Attorney General approved the boundaries drawn for 25 of the 27 congressional districts, he objected to the boundaries drawn for two districts and thus refused to preclear the plan. *Id.* Litigation ensued in federal court and the district court was forced to devise its own plan. Not content to remedy the specific objections to the two districts before it, the court decided to redraw the lines in other districts that had already been approved by the Attorney General. *Id.*

Upon appeal, the Supreme Court held that, in the absence of an objection from the Attorney General and in the absence of a specific constitutional or statutory viola-tion, the district court was required to defer to the legislative judgments inherent in the plan proposed by the legislature. *Id.* at 41, 102 S.Ct. 1518. Thus, the Court held, the district court erred in substituting its judgment for that of the Texas legislature. *Id.* at 41–42, 102 S.Ct. 1518. In reiterating its earlier holding in *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), the Court stated:

> We held there that the District Court erred when, in choosing between two possible court-ordered plans, it failed to choose that plan which most closely approximated the state-proposed plan. The only limits on judicial deference to state apportionment policy, we held, were the substantive constitutional and statutory standards to which such state plans are subject.

*Id.* at 42, 102 S.Ct. 1518 (citing *White v. Weiser,* 412 U.S. 783, 797, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973)).

A close reading of the holding in *Upham* reveals why it does not necessarily control on the facts of this case. Specifically, the *Upham* court held that "**in the absence of any finding of a constitutional** or statutory **violation** with respect to those districts, a court must defer to the legislative judgments the plans reflect, even under circumstances in which a court order is required to effect an interim legislative apportionment." *Id.,* 456 U.S. at 40–41, 102 S.Ct. 1518 (emphasis added). The 1992 Cobb plan, however, is fraught with unconstitutionality under the one-person, one-vote principle; hence, it can hardly be deemed a constitutional plan to which the Court's remedial plan must *necessarily* adhere, making only minimal changes thereto. Moreover, the Court cannot look in isolation at only one district, District Four, in devising its plan. Instead, as the Commission consists of four districts, the Court must look at all four districts in remedying

the constitutional violation. Finally, the state-proposed plan to which the Supreme Court in *Upham* said that the district court should have deferred was a recent plan that was responsive to the new census data, not a plan that had become outdated through the passage of a twelve year period of time.

Thus, in the instant case, the Court is faced, on the one hand, with an existing plan that was approved over a decade ago by the legislature, but is clearly unconstitutional now, and, on the other hand, with a current plan proposed by the affected county commission/local delegation that remedies the constitutional violations in the existing plan and that was passed by one house of the legislature, but was never put to a vote in the other. Accordingly, the Court concludes that the 1992 Cobb plan is not really analogous to the plan under review in *Upham,* in which the district court was presented with a *current* plan that had been recently approved by the state legislature, but had been objected to by the Attorney General solely with respect to two districts. It was only in this narrow factual context that the Supreme Court found the district court to have unduly meddled when it tinkered with those parts of the recent plan that were clearly constitutional and that had also been precleared by the Department of Justice.

In short, while the phrase "minimum change" is uttered as a mantra by whichever party in redistricting cases seeks a districting map that most closely resembles the outdated map that can no longer be used, this Court is not convinced that *Upham* requires it to adhere rigidly to an old, unconstitutional map whenever it de-

vises a remedial plan. Indeed, such an inflexible rule could sometimes cause a court to act as an abettor of those, who by political maneuvering, may have thwarted the legislature from passing proposed local legislation that it clearly would have adopted, had the matter simply been allowed to come to a vote. Being used in such a manner will generally not sit well with most courts. Nevertheless, although not required to do so, as a result of the time constraints in this case, the Court's plan does likely constitute only minimal change from the 1992 Plan.

### D. *Compliance with Section 5 of the Voting Rights Act*

Both the plaintiffs and the intervenors agree that any plan devised by this Court must comply with the Voting Rights Act (VRA). Only two sections of the Act—§ 5 and § 2—are potentially implicated by a remedial plan and the parties agree that only § 5 is actually in play in this dispute.

Under Section 5 of the Voting Rights Act, certain states, including Georgia, are prohibited from enforcing "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" unless they have either (1) obtained a declaratory judgment from the District Court for the District of Columbia that the change is not "for the purpose or with the effect of denying or abridging the right to vote on account of race or color," [14] or (2) submitted the proposed change to the Attorney General for "preclearance" and the change has been so precleared. 42 U.S.C. §§ 1973b–1973c. Thus, § 5 has a substantive component that has been interpreted to prevent change in voting plans that create retrogression in minority

---

14. Because the procedure for obtaining a declaratory judgment from the District Court of the District of Columbia is usually the more time-consuming alternative, states in jurisdictions covered by the VRA typically choose to seek preclearance from the Attorney General when presenting changes to apportionment plans. *See Johnson v. Miller,* 929 F.Supp. 1529, 1532 n. 5 (S.D.Ga.1996).

voting strength and a procedural component that requires covered jurisdictions to "preclear" [15] any change in their districting plans with either the DOJ or the D.C. District Court.

Intervenors argue that the plaintiffs' plan violates § 5's substantive prohibition of retrogression of minority voting strength. Further, intervenors argue that even leaving aside any potential retrogression in plaintiffs' plan, this Court cannot adopt that plan as its own without first preclearing the plan with the Attorney General.[16] The Court turns first to the preclearance requirement, before addressing the substantive "non-retrogression" requirement of the section.

### 1. Preclearance Requirement

■■■■ This preclearance requirement applies to changes in apportionment plans, and was intended to monitor those regions of the United States (primarily the Southern states) that, up to the time of the passage of the Act in 1965, had maintained voting "tests or devices" that resulted in the infringement of the right to vote of minority voters. See 42 U.S.C. § 1973b; see also Georgia v. United States, 411 U.S. 526, 531–535, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); Johnson v. Miller, 929 F.Supp. 1529, 1532 n. 4 (S.D.Ga.1996). As noted, all new legislative apportionment plans must be "precleared" by either the De-

partment of Justice or the District Court for the District of Columbia. McDaniel v. Sanchez, 452 U.S. 130, 137, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981). Section 5's preclearance mechanism does not apply to courts in creating remedial apportionment plans. Connor v. Johnson, 402 U.S. 690, 691, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). This exception to preclearance procedures does not arise, however, if a district court acts as a mere rubber stamp to an uncleared legislative plan. Specifically, in McDaniel, the district court in a covered jurisdiction concluded that the current apportionment plan for the county commission in question violated the one-person, one-vote rule. Accordingly, the court directed the commission to submit a proposed reapportionment plan to the court, after which the district court approved the plan, overruling the argument of the plaintiffs that this new legislative plan required preclearance under the VRA. McDaniel, 452 U.S. at 133–36, 101 S.Ct. 2224.

The Supreme Court reversed, noting that the legislative history of the statute indicates that a § 5 review of a new plan is excused only when, "because of exigent circumstances, the court actually fashions the plan itself, instead of relying on a plan presented by a litigant." Id. at 148–49, 101 S.Ct. 2224. Moreover, the Court expressed a concern that any other interpretation might encourage a covered jurisdic-

---

**15.** The terms "preclear" or "preclearance" appear to be misnomers. As there does not appear to be any further clearance procedures to hurdle after one has navigated through either the DOJ or the D.C. District Court, one should be deemed "cleared," not "precleared," when one has gained approval by either of those bodies. If so, the word "preclearance" finds company with similar terms, such as "prebook" and "preboard," as well as with the euphemistic phrase, "preowned."

**16.** Presumably, this Court would be unable to submit its plan to the D.C. District Court. At

the hearing, intervenors seemed to suggest their understanding that this Court would be able to submit its plan to the Attorney General for preclearance. Accordingly, the Court assumes that had it adopted the Commission's Plan, it could have submitted the latter for preclearance, had there been enough time. See Hughley v. Adams, 667 F.2d 25, 26 (11th Cir.1982) (a district court which sought and adopted a redistricting proposal from the affected county should have submitted the plan to the DOJ for preclearance; as a result of its failure to do so, the case would be remanded to allow that submission to be made).

tion that wished to avoid the preclearance procedure to refuse to redistrict after the census, thereby triggering litigation that would allow it to have its plan implemented by the reviewing court, instead of the Department of Justice or D.C. District Court.[17] *Id.* at 151, 101 S.Ct. 2224. Accordingly, the Court ruled that when a court acts as merely the conduit for a plan submitted by a legislative body of a covered jurisdiction, that plan must proceed through normal preclearance procedures under § 5 before becoming effective. *Id.* at 153, 101 S.Ct. 2224.

That a court must not act as a rubber stamp does not mean, however, that the court cannot consider the proposed legislative plan, just as it considers any other plans submitted to it. Moreover, this Court concludes that, as long as the district court makes an independent, *de novo* decision as to the appropriate remedial plan, such that the plan is the court's own, its plan does not have to be precleared, even if turns out to greatly resemble the proposed legislative plan. *See Bodker, supra* at 11–12 (court notes that although its plan greatly resembles the proposed legislative plan, the plan is nonetheless the court's own); *Johnson v. Miller*, 922 F.Supp. 1556, 1569 (S.D.Ga. 1995) (noting that fact that court's remedial plan may have resembled proposed legislative plan did not mean that plan was not the court's own; the court necessarily had to rely on legislative plans to determine how the latter had maintained district cores and communities of interest).

Indeed, assuming that most legislative bodies, in evening out population disparities, make sensible decisions about where lines should be redrawn, it would be surprising if there were not some substantial overlap between a court's remedial plan and the proposed plan on many occasions. Surely, a court is not required to engage in arbitrary and bizarre redrawing of lines just to show its independence.

In short, a court may consider a proposed plan, but the ultimate remedial plan must be the Court's own; otherwise, the preclearance procedures must be followed. As noted *infra*, the plans fashioned by the Court are the Court's own plans and hence do not have to be precleared.

2. *Prohibition Against Retrogression*

In fashioning a remedial plan, "a court should follow the appropriate Section 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases." *McDaniel*, 452 U.S. at 149, 101 S.Ct. 2224; *see also Abrams*, 521 U.S. at 95, 117 S.Ct. 1925 (the same). Of greatest significance in this case is the implication of the "non-retrogression" rule of § 5. As noted *supra*, § 5 has been interpreted to prevent retrogression in new voting plans. The intervenors, who are black voters residing in District Four, contend that the plaintiffs' proposed plan results in the retrogression of minority voting strength in that district, thereby violating § 5 of the VRA. The purpose of Section 5 of the VRA "has always been to

---

**17.** Of course, the opposite incentive appears to have been at work in this case. That is, it is undisputed that the Cobb Commission and School Board sought to undergo the preclearance procedures, inasmuch as they had created a redistricting plan that was approved and passed by the local legislative delegation and the State House, before being buried in a Senate committee. Clearly, in this case, the person or persons who sought to avoid pre-

clearance and who instead inferred some strategic advantage through a remedial plan by a district court were necessarily those same persons who opposed the proposed legislative plan, but who apparently lacked the ability to get their own proposal passed by the legislature, thereby causing them to persuade the pertinent Senate committee or its chair to hold the bill.

insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *see also Upham v. Seamon*, 456 U.S. 37, 39, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). Unlike legislative plans proposed by states, apportionment plans that are prepared and adopted by a federal court in order to remedy a constitutional violation are not subject to the preclearance requirement of Section 5. *McDaniel v. Sanchez*, 452 U.S. 130, 138, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981); *Connor v. Johnson*, 402 U.S. 690, 691, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971) (*per curiam*). Nevertheless, in constructing and adopting a remedial plan, courts must take into consideration the "non-retrogression" rule of Section 5. Thus, the remedial plan should not significantly impair the voting rights of minorities in comparison to the existing plan.

As noted, the intervenors argue that the proposed plan should not be adopted by the Court as to District Four, because it violates the "non-retrogression" rule of *Beer* by impairing the rights of black voters in District Four as compared to the existing plan. Beyond stating that the proposed plan violates the non-retrogression principle as to District Four, however, intervenors do not explain what the standards are for that principle. Neither do plaintiffs offer any helpful standards as to what the term means. Instead, with regard to the meaning of the term "retrogression," both the intervenors and the plaintiffs have been able to repeat only the same broad abstract descriptions found in case law.[18] Thus, the Court is given a circular explanation of retrogression: to wit, that retrogression under § 5 will not be deemed to occur if a proposed voting change has neither the purpose nor effect "of denying or abridging the right to vote on account of race or color." 42 U.S.C.A. § 1973c. The Court has further been told that § 5 is intended to prevent "backsliding" by prohibiting implementation of a voting change that has been enacted for a retrogressive purpose or that has a retrogressive effect on minority voting strength. (Int's Trial Mem. at 17), citing *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 335, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) and *Beer v. United States*, 425 U.S. at 141, 96 S.Ct. 1357. As a result, the Court is left only with an awareness that its plan must not retrogress, but is not very clear what that means.

■■■ One thing that is clear, however, is that in order to analyze whether a proposed change in an apportionment plan violates the non-retrogression rule, the court must first identify an appropriate benchmark by which to gauge whether the newly proposed plan "retrogresses" from the previous plan. The parties disagree as to what that benchmark should be. Both agree that this Court should look to the 1992 Plan. The intervenors argue, however, that one looks to the black voting age population currently living in the district,[19]

---

18. In fairness to counsel, there is likely little case law on the meaning of the term "retrogression," as typically the DOJ, on an *ad hoc* basis, makes the call whether a plan is retrogressive or not.

19. In determining retrogression and voter dilution matters under § 5 and § 2 of the VRA, one typically looks only to the black voting age population, not to the total black population. Both parties appear to agree on this point. Ironically, for one-person, one-vote purposes, one looks to the total population, not the voting age population. An argument could be made that the measures should be consistent, such that if voting age population is to be used for VRA determinations, it should also be used for the Equal Protection calculation. An argument could also be made that the current method of districting, which

as established by the most recent 2000 census, and as that district is presently constituted under the 1992 plan. Conversely, the plaintiffs contend that one looks to the number of voting age blacks living in the district at the time of the 1990 census, as broken down by the 1992 Plan. That is, plaintiffs argue that, in determining the retrogressive effects of a new plan, one does not consider additional population that may have entered the county in the last decade since promulgation of that plan.

These differing approaches present a very different calculation for purposes of determining retrogression. Thus, if one looks at the BVAP for Commission District Four, which is the only district that the intervenors have placed at issue for purposes of a retrogression argument, the current Census data shows that the BVAP currently represents 31.07% of the district's voting age population. Census data in existence in 1990, however, purportedly indicated that District Four had only 14.5% BVAP. The plaintiffs' proposed plan, as set out in Table 3, *infra* at 57, would result in a District Four consisting of 24.1% BVAP. Clearly, that proposal does not retrogress from the 1990 figure of 14.5% BVAP, but instead increases the BVAP in the district. If one compares the proposed district to the 31.07% BVAP now present in the existing District Four, however, the plaintiffs' proposal decreases the BVAP by about 7% (the difference between 31.07% and 24.1%). Whether or not it constitutes retrogression, plaintiffs' proposed plan clearly decreases BVAP in District Four from where it is in the currently configured plan.

Because the two benchmarks produce very different results, the Court must determine which benchmark is applicable. The plaintiffs have not cited any authority in support of their argument that the appropriate benchmark should be the BVAP in a given district as reflected in the 1990 Census data, versus the BVAP as reflected in the 2000 Census data. Although no court seems to have addressed this issue, straight on, the sense of these cases is that one would look to the present (2000 Census data) population in a given district to determine whether retrogression has occurred in a newly created district. *See, e.g., Reno v. Bossier Parish School Bd.,* 528 U.S. 320, 334, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) ("In § 5 preclearance proceedings—which uniquely deal only and specifically with *changes* in voting procedures—the baseline is the status quo that is proposed to be changed: If the change 'abridges the right to vote' relative to the status quo, preclearance is denied, and the status quo ... remains in effect."); *Holder v. Hall,* 512 U.S. 874, 883–884, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) ("under Section 5 ... the proposed voting practice should be measured against the existing voting practice to determine whether retrogression would result from the proposed change...."). The "baseline for comparison is present by definition; it is the existing status"). Indeed, in *Johnson v. Miller,* 929 F.Supp. 1529 (S.D.Ga.1996), the Court was required to analyze whether its own remedial plan complied with the nonretrogression principle of § 5. The Court adopted, as the proper benchmark, the last legislative plan that was constitu-

looks to the Census's counting of the population, undermines the one-person, one-vote principle because it counts as voters people who cannot legally vote, such as legal and illegal immigrants. That is, the vote of a voter in a district composed of a substantial number of persons who cannot legally vote is arguably strengthened, in violation of the Fourteenth Amendment, as compared to the vote of a voter who does not live in such a district. Neither party has made these arguments in this proceeding and the Court does not reach them.

tionally enacted, the 1982 plan, and, "to have a more accurate and current picture," updated that plan with the most current (1990) census figures. *Id.* at 1567. Likewise, this Court agrees that it would not make much sense to consider, as a benchmark, what the population in Cobb County looked like twelve years ago, when all parties agree that the population and demographics of the County are very different today.[20] Accordingly, the Court concludes that the appropriate benchmark should be the BVAP as the 2000 Census indicates it now exists, under the current 1992 plan.

That being the benchmark, the question is whether the plaintiffs' proposed plan "retrogresses" in District Four. Because plaintiffs attempted to support their contention that no retrogression had occurred only by arguing the propriety of a benchmark that the Court has concluded is not a valid measure of the status quo of BVAP in District Four, the plaintiffs have offered no argument why a 7% reduction in the BVAP in that district would not run afoul of § 5's nonretrogression rule. Indeed, the Court several times asked counsel for the plaintiffs whether a 7% reduction would constitute retrogression and, if so, whether such retrogression could be justified. Counsel responded only with an argument that the Court should use the invalid benchmark and that the Court should give deference to the Commission's plan. Neither argument is of any help in determining whether retrogression improperly occurred in the plaintiffs' proposed plan. Intervenors have argued only that this

degree of reduction of BVAP is obviously retrogressive.

The Court does not know whether the Department of Justice or the D.C. District Court would hold that this diminution of BVAP constitutes retrogression, had this question been presented to them. Again, as the matter was not briefed by either side, the Court is not even familiar with the standards that those bodies employ to decide the question. Clearly, had the proposed plan reduced BVAP from 51% to 44%, intervenors would have a stronger argument that the proposed plan had created retrogression, as it would have converted the district from a majority black district to a minority black district. Conversely, had the plan reduced the BVAP in a district from 15% to 8% or from 72% to 65%,[21] the Court doubts that there could be any argument that retrogression had occurred, as a 7% reduction would not alter the result in a district where blacks were either a small minority or a super majority. A reduction of BVAP from 31% to 24% is somewhere between the above two extremes. Thus, the fact that the BVAP has decreased in a particular district is not necessarily dispositive. Indeed, the intervenors' own plan creates a slight reduction in BVAP in District Four from where it is now under the 1992 plan.

█ Yet, when there is a 7% reduction in a BVAP from an original starting point of 31%, the Court concludes that the proponents of plan creating that reduction must at least offer some argument that the diminution is either not retrogressive or, if it is, that there is a justification for the

---

**20.** The Court notes that the plaintiffs' proposed plan indicates an increase of BVAP in each of the four districts over the BVAP in those districts in 1990, which reflects nothing more than the fact that black residents have increased in number throughout Cobb County in the last ten years.

**21.** In *Bodker, supra,* the reduction in BVAP in District 5 of the Fulton County Commission, as a result of the remedial plan promulgated by Judge Evans, was even more dramatic: from 93% BVAP to 65%. Given the still strong majority status of the minority in that district, Judge Evans concluded that no retrogression had occurred. *See Bodker, supra,* at 3 and 20.

retrogression. As plaintiffs have made neither argument, the intervenors' contention that the reduction constituted improper retrogression stands undisputed by plaintiffs at the present time. Accordingly, the Court must assume, for purposes of this proceeding only,[22] that the 7% reduction of BVAP in District Four constitutes retrogression. This assumption means that, even leaving aside § 5 preclearance concerns, the Court would not be able to use District Four, as configured by the plaintiffs, in its own remedial plan.

### E. Compliance with Section 2 of the Voting Rights Act

 Section Two of the VRA prohibits States from imposing or applying any voting practice or procedure that dilutes, denies, or abridges the right of any citizen of the United States to vote, on account of that citizen's race or color. 42 U.S.C. § 1973; see also Thornburg v. Gingles, 478 U.S. 30, 36, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In analyzing whether a particular apportionment plan complies with Section Two, a court must consider whether, under the totality of circumstances, minorities have been granted an equal opportunity to participate in the political process and to elect representatives of their choice. 42 U.S.C. § 1973(b); see also Abrams v. Johnson, 521 U.S. 74, 91, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997). Although Section 2 applies on its face only to States or political subdivisions of States, the Supreme Court has stated that "we will assume courts should comply with the section when exercising their equitable powers to redistrict." Abrams, 521 U.S. at 91, 117 S.Ct. 1925.

None of the parties or intervenors in this action have argued that the existing plan, or any of the proposed plans, violate Section Two of the Voting Rights Act. Furthermore, plaintiffs contend, and intervenors apparently agree, that it is not possible to create a voting district for the Cobb County Commission that is majority-black. A comparison of the black voting-age populations in each district under the existing plan, the two proposed plans, and the Court's plan, can be seen in Table 3, infra. The Court concludes that its plan does not have the effect of denying or abridging the right to vote of any citizen on account of race, and therefore, the plan complies with Section Two of the VRA.

### F. The Court's Plan

After consideration of the plaintiffs' and the intervenors' proposed plans and the parties' arguments in support of their respective plans, the Court created its own remedial plan with the very able technical assistance of the Court's appointed expert, Ms. Linda Meggers, Director of Legislative Reapportionment Services for the Georgia General Assembly.[23] The Court's plan was issued to the parties in its Order of May 31, 2002, and is attached hereto as Appendix D.

Although the Court's plan may resemble both the plaintiffs' and the intervenors' plans in certain respects, it was independently created by the Court, and thus is

---

**22.** Should the legislature actually pass a bill that resembles the plaintiffs' proposed plan, the Court does not view the plaintiffs as estopped from attempting to justify a 7% figure in preclearance proceedings. Similarly, should the legislature again fail to act, such that this Court will be required to convene a trial and adopt a final remedial plan, the Court does not conclude that plaintiffs are estopped from making whatever arguments they wish, at that time, in support of a reduction of BVAP in District Four or in any other district.

**23.** Ms. Meggers is undoubtedly the most knowledgeable person on the subject of reapportion in the State of Georgia, and all parties agreed to her appointment as the Court's technical expert in both the Perry and Smith actions.

not subject to the preclearance requirements of Section 5 of the VRA. *McDaniel v. Sanchez*, 452 U.S. 130, 138, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981); *Connor v. Johnson*, 402 U.S. 690, 691, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971) (*per curiam*). The most important goal in fashioning this remedial plan was to minimize the population deviations among the four districts, while also respecting the traditional districting principles of compactness, contiguity, the preservation of the core of the existing districts, and the preservation of significant political and geographic subdivisions, whenever possible. *See Abrams v. Johnson*, 521 U.S. 74, 95, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (slight deviations in population equality in court-ordered plans are justified in furtherance of significant state policies or unique features.)

#### 1. *Drafting of The Court's Plan*

The Court faced severe time constraints in drafting remedial plans for the Commission and School Board. In fact, the Court had only four days to create two plans and draft a brief order explaining the plans. It is difficult to envision a more exigent situation. Given the necessary haste with which the Court had to act, it opted for a plan that was the simplest to draft, that reduced population deviations among the four districts, and that otherwise appeared to conform to traditional districting principles of the State, such as contiguous and compact districts and the avoidance of the unnecessary splitting of precincts.[24]

In understanding the changes made by the Court to the existing districts under the 1992 plan, it is helpful to review the maps at Appendices A and D. In addition, Table 3, below, sets out a comparison between deviation and BVAP figures in the existing plan, the plaintiffs' proposed plan, the intervenors' proposed plan, and the Court's ultimate remedial plan.

Table 3: Comparison of County Commission Plans [25]

| | | Existing | Plaintiffs | Intervenors | Court |
|---|---|---|---|---|---|
| District 1 | Total | 191,889 | 150,642 | 153,176 | 152,843 |
| | Dev | + 26.29% | − 0.85% | + 0.81% | + 0.60% |
| | BVAP | 13.51% | 14.70% | 10.09% | 12.41% |
| District 2 | Total | 138,530 | 152,673 | 151,058 | 150,548 |
| | Dev | − 8.82% | + 0.48% | − 0.58% | − 0.91% |
| | BVAP | 20.00% | 21.18% | 24.78% | 19.32% |
| District 3 | Total | 130,053 | 153,953 | 153,025 | 151,878 |
| | Dev | − 14.40% | + 1.33% | + 0.72% | − 0.04% |
| | BVAP | 6.03% | 11.03% | 4.89% | 7.59% |
| District 4 | Total | 147,279 | 150,483 | 150,492 | 152,482 |
| | Dev | − 3.07% | − 0.96% | − 0.95% | + 0.36% |
| | BVAP | 31.07% | 24.01% | 30.53% | 31.34% |
| Total Dev. | | 40.70% | 2.28% | 1.77% | 1.51% |

The Court began by noting that under the current 1992 plan, District One had a

**24.** As neither incumbent is running again for Districts One and Three, which are up for election this summer, and as no plan considered by the Court affected the incumbents in Districts Two and Four, which will not be up for election until 2004, incumbency was not a consideration in the Court's remedial plan for the Commission.

**25.** The Existing Plan indicates the current population breakdown, as established by the 2000 Census, for the currently configured districts, as established by the 1992 Plan.

deviation of +26%, which meant that District One had an excess of almost 40,000 people above the ideal district size of 151,938. The other three districts were all below the ideal size.[26] Accordingly, the Court was required to move 40,000 people from District One to one or more of the other three districts to even out the deviation. The Court began by moving Oregon 4 from District One to District Four. (*See* Maps for Appendices A and D.) This one shift brought almost 5,000 more people into District Four, giving it a .37% deviation, meaning that its population was fairly close to the ideal district size, and the Court left it with only this one change.

The Court still had to move 35,000 people from District One to Districts Two and/or Three. Because District One bordered District Two only at one precinct, it was obvious that it would be simpler to shift persons from District One to District Three, which had a much longer border with District One. Otherwise, shifts from One to Two could create non-contiguous, non-compact districts. Thus, District Three was forced to be the district that underwent the greatest upheaval among the three underpopulated districts.

To effect this shift, the Court moved District Three's line westward, picking up some precincts in their entirety and rejoining precincts that had previously been split,[27] where possible. The Court attempted to avoid unnecessary precinct splitting.[28] For the most part, the Court used I–75 as the dividing line between Districts Three and One, although population considerations and the desire not to split precincts unnecessarily required a small incursion across I–75 by District Three in the south part of that district. These shifts from One to Three reduced the population deviation of District One down to .6% over the ideal population size for a district.

District Two was also underpopulated relative to the ideal district size at the beginning of the redistricting process, with a –8% population, meaning that it needed an infusion of approximately 13,000 people to reach ideal size. Again, because District Two was not contiguous with District One and because District Four had achieved population balance by the addition of Oregon 4, it was left again to District Three to shoulder the necessary shifts to District Two. As District Three had now increased to an over-population status by the addition of so much District Four territory, the Court removed two precincts[29] from it and placed them in District Two. Most of the rest of the changes to District Two to get it to an ideal population size involved unsplitting precincts that had previously been split between one or more districts. At the end of this process, the total overall deviation for the entire remedial plan was 1.51%

### 2. Compliance with Section 5 of the Voting Rights Act

As noted *supra*, in drafting a remedial plan, a court is expected to comply with the non-retrogression principle of § 5. As

---

**26.** District Two was approximately a –9%, District Three was approximately a –14%, and District Four was approximately a –3%.

**27.** For example, Marietta 5B had been split between Districts One and Three. With the remedial plan, the district was rejoined entirely in District Three.

**28.** Population considerations required the Court to split Elizabeth 1, along I–75, but the

Court learned that both the State House and Senate line had also split the precinct at this point. Thus, hopefully voter and election official confusion will likely not be further increased as a result of the Court's split of this precinct.

**29.** Mt. Bethel 3 and Dickenson 1.

Table 3 indicates, the BVAP for Districts 1–4 in the existing plan was:

District 1 13.51%
District 2 20%
District 3 6.03%
District 4 31.07%

The BVAP for these same districts under the Court's remedial plan is:

District 1 12.41%
District 2 19.32%
District 3 7.59%
District 4 31.34%

The intervenors had expressed concern about retrogression only in District Four. The Court's plan did not retrogress, but instead increased the BVAP very slightly in District Four by .27%, from 31.07% to 31.34%. As to the other three districts, there were slight decreases in two districts and a slight increase in one district: none of which implicated any retrogression issues.

With regard to the need for the plan to be the Court's own, this plan is clearly that. As to District Four, the Court's plan could not resemble closely the plaintiffs', because of the latter's failure to address the retrogression issue. While the Court's plan more closely resembles the intervenors as to the composition of District Four, the Court's plan rejected intervenors' proposal as to District Two, which plan would have created great dislocation in that district.[30]

3. *The Court's Plan Complies with the Principle of One–Person, One–Vote*

 Unless there are "persuasive justifications," a court-ordered reapportionment plan must "ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Chapman v.*

*Meier*, 420 U.S. 1, 26–27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *see also Abrams*, 521 U.S. at 98, 117 S.Ct. 1925; *McDaniel v. Sanchez*, 452 U.S. 130, 139, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981). Although there is no absolute "cut-off" for the level of overall popularity deviation allowable in court plans, court-ordered plans are generally held to stricter standards of population equality than legislative plans, and thus, courts should strive for overall population deviations even smaller than 10%. *See Connor v. Finch*, 431 U.S. 407, 414–415, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Chapman*, 420 U.S. at 26–27, 95 S.Ct. 751. Plans regarding the apportionment of the electoral districts for local governments, however, are not held to the same exacting standards as the apportionment of congressional districts, because "the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality." *Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); *see also Chapman*, 420 U.S. at 27 n. 19, 95 S.Ct. 751.

Under the Court's plan, none of the districts deviates from the ideal district size by more than one percentage point. Furthermore, the Court's plan has an overall deviation of only 1.51%, which is a smaller total deviation than either of the plans proposed by the parties. (*See* Table 3.) Thus, the Court concludes that the plan's deviation from perfect population equality is *de minimis*, and the plan complies with the principle of one-person, one-vote as required by the Fourteenth Amendment.

 Although minimizing the population disparities among the four districts

---

**30.** The Court notes that while the BVAP remains largely the same in its plan in the two districts that have the largest black population, intervenors' proposed District Two would have increased the BVAP from 20% to almost 25%. The BVAP in the Court's District 2 was 19.32%, whereas in the existing plan, the BVAP was only slightly higher, at 20%.

was the Court's primary goal in creating the remedial plan, it also respected the traditional districting principles of compactness, contiguity, and the preservation of the core of the existing districts, as well as Georgia's "strong historical preference" not to split precincts whenever possible. *See Abrams,* 521 U.S. at 99, 117 S.Ct. 1925. Accordingly, any slight deviation from perfect equality among the populations of each district is justified because of the Court's attempt to respect these other important considerations. *See id.* at 95, 117 S.Ct. 1925 (slight deviations in population equality in court-ordered plans are justified in furtherance of significant state policies.)

Thus, the Court concludes that its plan creates little more than a *de minimis* deviation from perfect population equality, and that the plan is constitutional and complies with both § 2 and § 5 of the Voting Rights Act.

### G. *Use of the Court's Commission Plan In Future Redistricting Plans*

The Court's remedial plan is interim in nature and can only be used for the upcoming elections in Districts One and Three. It is clear that as, a legal matter, the Court's plan cannot be considered as a benchmark for any future redistricting efforts by the legislature. *Johnson v. Miller,* 929 F.Supp. 1529 at 1562 (S.D.Ga. 1996). The Court also emphasizes that, as a practical matter, the County Commission and local delegation should likewise not feel constrained to necessarily adopt the Court's plan, although adoption of the plan is certainly an option. Indeed, if the Court finds itself once again faced with the task of entering a final redistricting order

for the Cobb Commission, it will likewise not feel constrained to use its own interim plan, if an alternative plan seems preferable.

The Court offers this caution for several reasons. First, as noted, this plan was drafted in great haste. The Court was not privy to the kinds of political and community concerns that would be pertinent to a legislative body when it redistricts. Further, there are some obvious drawbacks to the Court's plan. First, the Court's plan leaves District One, the fastest growing district, with a plus deviation of .6% (or 905 people over the ideal district size). While that is a only a slight deviation, a permanent plan may seek to insure that District 1 be drawn as the most underpopulated district, as that district is presumably going to continue to grow.[31]

Second, and more fundamentally, a review of the Court's plan reveals that District Three was required to take the bulk of surplus population from District One, thereby altering greatly that district. When proposing a new plan for presentation to the legislature, the Commission/local delegation will want to decide whether it wishes that District Three should shoulder the entire burden of redistricting. As noted, under the existing plan, District One had 40,000 too many people. While one could shift most of those people to one district, as the Court did, one could also endeavor to divide evenly these people among the remaining three districts, which would involve each district taking approximately 13,000 more people from District One. Alternatively, as District Two is not contiguous with District One, one could attempt to divide the 40,000 people between the two districts that border District One and thereby shift 20,000 people from District One to District Four[32] and 20,000

---

**31.** Notwithstanding the intervenors' objection that the Court could not consider such a factor, the Court disagrees. Nevertheless, given the time involved, the Court was unable to arrive at a negative deviation for District One, without a great deal more upheaval than

had already been accomplished in the Court's plan.

**32.** Of course, as this exercise is a zero sum game, one would then have to remove 15,000

people from District One to District Three. As a final alternative, one could shift a majority of these 40,000 people to District Four, instead of District Three, but one would have to be mindful of any appropriate retrogression principles, if such are applicable to this shift.[33]

The Court does not believe that it was precluded from attempting the above or that it would be precluded from doing so in a final plan. As noted *supra* at 1291–1294, the Court concludes that intervenors have overstated the applicability of the "minimal change" rule to this case. Moreover, even to the extent that the Court is subject to that principle, it notes that "minimal change" is in the eyes of the beholder. That is, because redistricting is a zero sum game, if one district is subject only to minimal change, within a four district body in which 40,000 people are being shifted, another district or districts will necessarily undergo a maximal change. While District Four voters may correctly discern that minimal change was accomplished as to them, because their district received only one new precinct, District Three voters would understandably perceive that their district underwent a much more dramatic transformation. Indeed, the Court suspects that had the racial demographics of District Four and District Three been flipped, intervenors would not have been arguing for a minimal change in District Four, but instead would have sought to leave District Three intact and add the surplus population to District Four. In short, the "minimal change" concept can be applied to either the whole plan or to only one district, in isolation. The decision whether to take a macro or a micro approach to the task will determine how the ultimate plan will look.

Of course, any redistricting effort will have to be cognizant of the need to comply with the non-retrogression principle of § 5. As noted, the Court does not know what kind of diminution of BVAP in District Four would be considered by the DOJ or D.C. District Court as retrogressive and, again, does not know whether the latter would have approved a 7% reduction of BVAP in District Four. Although the Court kept the BVAP in District Four at roughly the same level as it was in the existing, unconstitutional plan, it does not mean to suggest that retrogression would necessarily occur, if the percentage is lowered by the need for District Four to take on some of the excess population of District One. Indeed, intervenors, themselves, proposed lowering the BVAP in District Four by approximately half a percentage point. Further, while the Court has accepted the 31.07% figure in the existing plan as the benchmark figure for BVAP in District Four, it notes either that this figure may be somewhat inflated, because of the population surplus in the contiguous District One and population deficit in contiguous District Two, or that a legitimate need to move people from District One to District Four or Four to Two could potentially serve as an appropriate justification for some lowering of that number, if that were the consequence of such a shift. Again, the Court does not know precisely wherein lie the retrogression parameters here, but emphasizes that its plan does not seek to set any such limits.

In sum, the Court's plan is just that: an interim plan that can be reviewed and

---

people from the eastern border of District Four and put them in District Two, as Four would then be overpopulated by that amount.

**33.** Of course, assuming that one shifted all of the 40,000 people to District Four, one would

then have to shift 35,000 people from District Four to Districts Three or Two, as District Four would become overpopulated by that number of people.

changed following this election cycle, if the legislature or the Court decide to do so.

### III. *The Smith Case (School Board Posts)*

Like the plan for the County Commission districts, the existing 1992 plan for the voting districts for the Cobb County Board of Education is unconstitutional because it violates the fundamental principle of one-person, one-vote. In order to remedy the obvious constitutional violations inherent in the existing voting districts for the Cobb County School Board posts, in early 2002, the members of the Board participated in drafting a new plan to present to the Georgia Legislature that would better equalize the population among the four School Board districts to comply with constitutional requirements. As discussed above, the plan had the approval of the majority of the members of the local delegation from Cobb County and passed the House of Representatives, but was never presented to the Senate for a vote. The *Smith* plaintiffs, who include individual Cobb County voters as well as the members of the Board, have asked the Court to adopt the plan that was created by the Board and passed by the House of Representatives.

The putative intervenors object to adoption of the School Board plan, which has been submitted by the Smith plaintiffs. As with the proposed Commission plan, intervenors note that this Court cannot adopt the Board's plan without first subjecting that plan to preclearance by the DOJ, pursuant to § 5 of the VRA. *See* discussion supra at 1294–1295. Unlike their objections to the Commission plan, however, the intervenors' objections to the School Board plan do not focus on any violation of the substantive provision of § 5: that is, retrogression. Instead, intervenors concede that the Board's proposed plan does not retrogress with regard to minority strength in any of the seven

Board posts. Instead, the putative intervenors object to the *Smith* plaintiffs' proposed plan solely on the ground that the plan does not sufficiently achieve population equality among the seven districts. Accordingly, intervenors urge the Court either to adopt their proposed plan or to adopt a plan that results in a lower population deviation than does the Board's plan.

#### A. *Plaintiffs' Proposed Plan*

The *Smith* plaintiffs, who include individual Cobb County voters as well as the members of the Board, have asked the Court to adopt the plan that was created by the Board and passed by the House of Representatives. They argue that the plan remedies the constitutional violations of the 1992 plan, and complies with the one-person, one-vote principle of the Fourteenth Amendment. They also contend that the proposed plan complies with all requirements of the VRA, including Sections 2 and 5. They argue that the plan reflects the legislative policies of the Cobb County Board of Education, whose members have been elected by the voters of Cobb County. They finally argue that this plan best accomplishes adherence to traditional districting principles and gives recognition to a unique feature of school board districting.

The *Smith* plaintiffs' proposed plan for the School Board districts is attached hereto as Appendix G. A comparison of that plan with the existing plan, the putative intervenors' plan, and the Court's remedial plan is found at Table 4, below. Under the plaintiffs' proposed plan, Post One has a deviation of –2.97%, Post Two has a deviation of 1.38%, Post Three has a deviation of –0.88%, Post Four has a deviation of 1.57%, Post Five has a deviation of 1.89%, Post Six has a deviation of 1.42%, and Post Seven has a deviation of –2.57%, for a total overall deviation of 4.86%. Thus, the plaintiffs' proposed plan reduces the large population deviations in the existing

plan, and the Court finds that it is well within the maximum 10% population deviation ordinarily allowed for legislative plans under the one-person, one-vote standard. (Intervenors have argued, however, that this deviation is not within the more stringent *de minimis* deviation standards imposed on court-ordered remedial redistricting plans.)

In addition to greatly diminishing the existing disparities in population among the seven districts, the School Board plan has also taken into consideration the strong communities of interest that exist around the attendance zones for the high schools in the County, as well as the elementary and middle "feeder schools" that send students to those high schools. The *Smith* plaintiffs have presented a compelling argument that these attendance zones for the high schools and their feeder schools represent a "unique feature" of the School Board plan that should be taken into consideration by the Court. (*Smith* Pls. Trial Br. at 2.) The plaintiffs presented evidence that a great deal of consideration was given to keeping the population in a particular attendance zone within one School Board Post, so that students attending a particular high school would, as much as possible, all be represented by the same School Board member. For example, under the plaintiffs' proposed plan, all of the students attending Harrison High School would live within Post 1, all of the students attending the brand-new Kell High School would live within Post 4, and all the students attending Pope High School would live within Post 5.

According to the plaintiffs, aligning the school attendance zones with the boundaries of the School Board posts achieves several important policy objectives that are important to the members of the School Board and their constituents. First, it promotes accountability of the elected Board members to their constituents. Plaintiffs indicated that a school board member is given primary responsibility for those schools within his or her district. Common sense dictates that a Board member who represents the majority of people within a single high school attendance zone will be more accountable to the voters than a School Board member who represents people living in the attendance zone of a school outside his district or who shares responsibility for many different schools with multiple other Board members. Second, it reduces voter confusion about the identity of their School Board representative. Third, it reduces the possibility of a single student being governed by Board members in different districts as the student moves from elementary school to middle school to high school.

### B. *Putative Intervenors' Proposed Plan*

Because the Court has concluded that the putative intervenors have failed to demonstrate that they have any legally cognizable interests that are not being adequately represented by the plaintiffs, the Court has denied the putative intervenors' motion to intervene. (*See* discussion on motions to intervene, *infra.*) Nevertheless, for the purpose of completeness, the Court summarizes their plan and the deficiencies that the Court perceives in the plan.

The intervenors' proposed plan does reduce the population deviations among the seven districts better than does the plaintiffs' plan. The plaintiffs' plan resulted in a total deviation of 4.86%; the intervenors' plan creates a deviation of only 1.73%. Otherwise, the intervenors' plan has some substantial drawbacks. First, the intervenors have not indicated that the drafters of their plan have made any effort to respect high school attendance zones and the attendance zones for feeder schools to those high schools. Second, unlike the plaintiffs'

plan, the intervenors' plan removes incumbents out of two districts, leaving two districts with no incumbents, and putting these two incumbents in two new districts with preexisting incumbents.[34] While protection of incumbents is perhaps not as high a priority as some other considerations in districting, it is still a part of the State of Georgia's traditional districting principles, which principles this Court is expected to defer to in drafting its remedial plan. *See Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983); *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Johnson v. Miller,* 922 F.Supp. 1556, 1564 at n. 10 (S.D.Ga.1995).

Moreover, absent some good reason to remove incumbents from their districts and pit them against other incumbents—which reason intervenors have not advanced—the Court would be acting in a high-handed and irresponsible manner were it to take such drastic, arbitrary action when alternatives to that prospect exist. Clearly, such action would undermine preservation of the status quo, which goal was a centerpiece of intervenors' position regarding the Commission redistricting.

Third, while non-retrogression was a key argument advanced by intervenors in the Commission dispute, with the School Board, it is the same intervenors who seek a watering down of minority votes. That is, under the existing plan, the Board post with the largest BVAP is Post 3, which has 34.04% BVAP. Post 3 is also the only one of the seven posts whose member is a Democrat. Plaintiffs' proposed plan preserves that voting strength and, in fact, increases it a bit, to 34.3%. Intervenors'

plan, however, decreases the BVAP by over 2 percentage points, down to 31.76%. Intervenors have offered no persuasive explanation of why this change is an improvement over the plaintiffs' plan.

Accordingly, because intervenors' plan is flawed in some basic features, the Court did not rely on it in devising its own remedial plan for the School Board.

### C. *The Court's Plan*

In light of all the considerations described above, the Court has devised its own remedial plan for the School Board. The Court's plan has attempted to minimize the deviations in population and to respect traditional districting principles, as well as to recognize the "unique feature" of school board districting: to wit, adherence as much as possible to the school attendance zones in creating districts.

Albeit similar to the plaintiffs' proposed plan, the plan arrived at by the undersigned is this Court's own plan. In designing the plan, the Court was forced to use the plaintiffs' plan as a starting point, however, as the other two available plans were not suitable. That is, as noted, the intervenors' plan did not attempt to comply with the unique feature of school board districting necessary in drafting the Court's plan. Further, the latter plan ignored the need to protect incumbency and offered no explanation for its decrease of black voting strength in District 3. The existing plan was also deficient as a starting point, as the latter was devised ten years ago and obviously did not reflect changed school attendance zones or the creation of new schools.[35] Thus, the Court deferred to the districting principles em-

---

**34.** As the Court understood the proffer, intervenors' plan would remove the Board member from District 7, Dr. Plenge, and put her in District 2, which has an incumbent, Curt Johnston. The plan would also remove Board Member Searcy from District 4 and pit her against District 5 Member Johnny Johnson.

**35.** That said, the plaintiffs' plan does appear to capture the "core" of the existing board zones.

ployed by plaintiffs, albeit not necessarily to their plan. Yet, because the Court adhered to these same principles, its plan necessarily resembled that of the plaintiffs.

With regard to the plaintiffs' plan, intervenors have not contended that the former plan has failed to comply with its stated goal of keeping a particular school attendance zone within one post, as much as that is possible. Nevertheless, the Court endeavored, on its own, to see if there were any parts of the plan where the plaintiffs had failed to adhere to this stated goal and where the Court could better comply with this unique feature of school board districting. Discerning school attendance zones and their overlap with board posts was a tedious task and the Court cannot be certain, given the short period of time available to it and the absence of a detailed map showing the overlap between attendance zones and post lines, that it has arrived at the best plan. Further, the Court's task was made more difficult by the need to avoid unnecessarily splitting precincts and the need to avoid excessive population deviations.

Having undergone this exercise, the Court made some changes in the plan submitted by plaintiffs. The primary changes made by the Court are as follows. First, the Court removed the Dobbins precinct and a Smyrna precinct that had been in Post 6 in the plaintiffs' proposal, and put these precincts into Post 2. Placement of these precincts in Post 6 had rendered the latter district less contiguous and compact than it appeared it could be.[36] Shifting these precincts to Post 2 also had the effect of placing precincts that appeared to

be in the Campbell school attendance zone back into their appropriate post.

Chattahoochee 1 is a large precinct that was in Post 2 of the proposed plan. The Court noted, however, that the part of Chattahoochee 1 east of I–75 was in the attendance zone of Wheeler High School, which was in Post 6; the part of Chattahoochee west of I–75 was in the Campbell zone and hence was properly in Post 2. As Chattahoochee was a large precinct of 9,000 people that was more amenable to being split for population equalization purposes than other precincts, the Court split it along the line of I–75, thereby, for the most part, putting the Wheeler part of the precinct in Post 6 and keeping the Campbell part in Post 2.[37]

The Court moved Poole precinct from Post 2 to Post 7, which reunited the Osborne attendance zone into one post and which added people to a post that had been underpopulated. Bells 2 Precinct had been split between Posts 4 & 5. The Court put all of Bells 2 into Post 4, which appeared to be the appropriate attendance zone for that precinct. The Court also made other technical changes in the plan.

D. *Compliance with § 5 and One–Person, One–Vote Precept*

As noted in Table 4, below, the Court's plan does not significantly alter the BVAP in any post from where it is in the existing plan. Accordingly, there is no retrogression in the Court's plan. Like the Commission plan, there are no § 2 implications to any School Board plan considered or drafted by the Court.

---

**36.** Of course, there might have been sound political or community-based reasons for the placement of these precincts in District 6. The Court was necessarily unaware of those reasons.

**37.** Population constraints prevented the Court from keeping all of the west part of the precinct back in Post 2, but the small portion placed in Post 6 appeared to be primarily commercial property.

Table 4: Comparison of School Board Plans

| | | Existing | Plaintiffs | Intervenors | Court |
|---|---|---|---|---|---|
| Post 1 | Total | 115,152 | 76,096 | 77,822 | 78,253 |
| | Dev | + 46.58% | − 2.97% | − 0.77% | − 0.22% |
| | BVAP | 11.15% | 5.91% | 8.54% | 6.06% |
| Post 2 | Total | 73,792 | 79,514 | 77,948 | 78,349 |
| | Dev | − 6.07% | + 1.38% | − 0.61% | − 0.10% |
| | BVAP | 22.17% | 21.43% | 23.77% | 22.67% |
| Post 3 | Total | 81,798 | 77,737 | 79,142 | 77,737 |
| | Dev | + 4.12% | − 0.88% | + 0.91% | − 0.88% |
| | BVAP | 34.04% | 34.30% | 31.76% | 34.30% |
| Post 4 | Total | 73,760 | 79,657 | 78,165 | 79,716 |
| | Dev | − 6.11% | + 1.57% | − 0.34% | + 1.64% |
| | BVAP | 7.53% | 9.50% | 11.35% | 9.44% |
| Post 5 | Total | 64,321 | 79,908 | 79,042 | − 77,803 |
| | Dev | − 18.13% | + 1.89% | + 0.78% | − 0.80% |
| | BVAP | 5.70% | 5.20% | 5.83% | 5.08% |
| Post 6 | Total | 62,699 | 79,539 | 79,072 | 79,704 |
| | Dev | − 20.19% | + 1.42% | + 0.82% | + 1.63% |
| | BVAP | 4.89% | 12.08% | 4.68% | 11.10% |
| Post 7 | Total | 78,408 | 76,416 | 77,787 | 77,441 |
| | Dev | − 0.19% | − 2.57% | − 0.82% | − 1.26% |
| | BVAP | 27.41% | 27.50% | 29.20% | 27.24% |
| Total Dev. | | 66.77% | 4.86% | 1.73% | 2.90% |

As explained in its discussion of its remedial plan for the County Commission districts, unless there are "persuasive justifications," a court-ordered reapportionment plan must "ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Chapman v. Meier*, 420 U.S. 1, 26–27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *see also Abrams v. Johnson*, 521 U.S. 74, 98, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997); *McDaniel v. Sanchez*, 452 U.S. 130, 139, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981). As to the population deviation in the interim plan, the deviation is 2.9%, which is lower than the 4.86% deviation in plaintiffs' proposed plan. The Court considered several other alternatives to further reduce the deviation figure, but each alternative created more problems than it solved, either by further splitting precincts or further splitting attendance zones. The Court concludes that the 2.9% deviation in its plan is *de minimis* and complies with the constitutional requirement of one-person, one-vote. *See Wyche v. Madison Parish Police Jury*, 635 F.2d 1151 (5th Cir.1981) (finding a 4.11% overall population deviation *de minimis* in court-ordered plan in parish police jury redistricting case); *Markham v. Fulton County Board of Registrations & Elections et al.*, C.A. No. 1:02–CV–1111–WBH (N.D.Ga. May 29, 2002) (an overall deviation of 3.71% for a court-ordered apportionment plan for the Fulton County School Board was *de minimis*).

Furthermore, although a court-ordered plan is generally held to very strict standards of population equality, plans regarding the apportionment of the electoral districts for local governments are not held to the same exacting standards as the apportionment of congressional districts, because "the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality." *Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971);

*see also Chapman,* 420 U.S. at 27 n. 19, 95 S.Ct. 751. Although the deviations in the Court's plan are small, the Court finds that, where the deviations in the districts are not as close to zero as possible, they are justified by the Court's consideration of the "unique feature" of the school attendance zones. *See Abrams,* 521 U.S. at 98–100, 117 S.Ct. 1925 (unique features and significant state policies may justify small population deviations). Specifically, the Court has been persuaded by plaintiffs' arguments that keeping school attendance zones unified within the School Board districts is both a unique feature of school board districting requirements and a traditional policy in that milieu. While minimizing the overall population deviation as much as possible, the Court has also considered the traditional districting principles of compactness, contiguity, preservation of the core of the existing districts, and Georgia's "strong historical preference" not to split precincts whenever possible. *See Abrams,* 521 U.S. at 99, 117 S.Ct. 1925. In short, the Court concludes that the plan's deviation from perfect equality in the population among the districts is *de minimis,* and that it complies with the principle of one-person, one-vote as required by the Fourteenth Amendment.

## IV. *Motions to Intervene*

As noted above, almost one month after the complaint was filed in the *Smith* action and just three days before the hearing was scheduled to take place in the two actions, David L. Wilkerson and Mark A. Bell filed motions to intervene as defendants in both the *Smith* and *Perry* actions, and the Georgia Democratic Party filed motions in both cases to appear as an *amicus curiae.* Wilkerson and Bell are African–American voters who reside in the existing Commission District Four and the existing School Board Post 7. They have sought intervention to oppose the plaintiffs' proposed apportionment plans and to submit their own plans for the Court's consideration; the Georgia Democratic party supports the plan proposed by the putative intervenors.

Although the parties in the *Perry* case did not object to the motions to intervene, the plaintiffs did object to intervention in the *Smith* case. Because of the extreme time constraints, however, the Court did not have an opportunity to rule on the motions to intervene before the hearing scheduled for May 24, 2002, and the Court allowed counsel for the putative intervenors to appear at the hearing and to present proposed apportionment plans for the Court to consider.

### A. *Legal Standards*

Regardless of the theory of intervention, a court may only grant a motion to intervene that is timely filed. *See Meek v. Metropolitan Dade Cty., Fla.,* 985 F.2d 1471, 1478–1479 (11th Cir.1993). Timeliness is to be determined from all the circumstances of the case, including such factors as the length of time during which the would-be intervenor knew or should have known of his interest in the case, the extent of prejudice the parties might have suffered as a result of any delay in filing the motion to intervene, and the existence of unusual circumstances. *Id.* at 1478–1479; *see also NAACP v. New York,* 413 U.S. 345, 367, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973); *Chiles v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir.1989).

Although all the parties in this action would have been better served had the putative intervenors filed their motions to intervene sooner, under the totality of the circumstances of this case, and the short time period in which every party has had to operate in these actions, the Court will accept the motion to intervene as timely filed.

The standards for intervention are established in Federal Rule of Civil Procedure 24, which provides both for intervention as a matter of right, and permissive intervention:

(a) **Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when an application claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties; and

(b) **Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

FED. R. CIV. P. 24.

In this case, the putative intervenors argue that they have legitimate interests, as African–American voters of Cobb County, that are not being adequately represented by any of the parties in these actions. Thus, they argue that they are entitled to intervene in both the *Smith* and *Perry* cases as a matter of right, or at the very least, the Court should grant their motion under permissive intervention; alternatively, they request that the Court allow them to appear as *amici curiae*.

B. *Motion to Intervene in County Commission Case*

 The parties in the *Perry* case have not opposed Wilkerson and Bell's motion to intervene. Furthermore, the Court concludes that the intervenors have asserted a legitimate interest in the *Perry* case that is not adequately represented by any of the parties. The intervenors have objected to the plaintiffs' proposed plan on the grounds that it impairs minority voting strength in County Commission District Four as compared to the existing plan, and thus, that the plaintiffs' proposed plan violates the "non-retrogression" rule of Section 5 of the Voting Rights Act. The Court finds that this is a legitimate interest in the action that is not being represented by any party currently involved in the case.

Accordingly, the motion to intervene by Wilkerson and Bell in the *Perry* case [8], along with the motion by the Georgia Democratic Party to appear as an *amicus curiae* [9] are both **GRANTED.** Wilkerson and Bell will be permitted to intervene as party-defendants in the *Perry* action.

C. *Motion to Intervene in School Board Case*

 Wilkerson and Bell have also moved to intervene in the *Smith* case, which involves the apportionment plan for the Cobb County School Board. The putative intervenors, who reside in Post 7, argue that they have a legitimate interest in the *Smith* case because they are African–American voters in Cobb County who have a right to be heard, and that, if they

are not allowed to intervene, this action will have no "adversarial" party.

Unlike the Commission case, however, in the School Board case, the putative intervenors have not presented any argument that minority voting strength is being diluted, impaired, abridged, retrogressed or affected in any way by the plaintiffs' proposed plan. That is, they have not objected that the plaintiffs' proposed plan violates either Section 2 or Section 5 of the Voting Rights Act. Moreover, in reviewing the apportionment plan for the School Board proposed by the intervenors, the Court has noted that the plaintiffs' proposed plan arguably safeguards the rights of minority voters better than does the putative intervenors' plan. For example, in Post 3, the existing School Board post with the largest percentage of black voting-age population ("BVAP") of all the posts, 34.04%, and the only post that is held by a Democrat, the plaintiffs' proposed plan would increase the BVAP to 34.30%, while the putative intervenors' plan would reduce the BVAP to 31.76%.

When pressed on this point at the hearing, counsel for intervenors acknowledged that his client's interest went only to assuring implementation of the one-person, one-vote rule and did not implicate any racial issues. In that regard, counsel argued that the putative intervenors' interest was in the creation of a plan that complied with the one-person, one-vote principle. Yet, this is the exact claim asserted by the plaintiffs, who are also voters of Cobb County. In essence, then, the putative intervenors merely want an opportunity to present an alternative apportionment plan to the Court that differs from the plan presented by the plaintiffs, but they have

failed to explain how the plaintiffs are not adequately representing their interests in any way.

The Court concludes that achieving population equality is an interest of all Cobb County voters that is not unique to the putative intervenors.[38] Indeed, that goal is the stated aim of the plaintiffs in bringing this claim. When applicants for intervention seek to achieve the same objectives as an existing party in a case, that party is presumed to represent the movants' interests adequately. See United States v. City of Miami, 278 F.3d 1174, 1178–1179 (11th Cir.2002); Meek v. Metropolitan Dade Cty., Fla., 985 F.2d 1471, 1477 (11th Cir.1993); FSLIC v. Falls Chase Special Taxing Dist., 983 F.2d 211, 215 (11th Cir.1993). Second, when the party representing the interest of the movants is a governmental entity, there is also a presumption that elected officials will represent the interests of their constituents adequately. See United States v. Georgia, 19 F.3d 1388 (11th Cir.1994) (county school board charged by law to represent the interests of the students); see also Clark v. Putnam Cty., 168 F.3d 458, 461 n. 3 (11th Cir.1999) (noting the general presumption that elected officials will represent their constituents).

In this case, the Smith plaintiffs include the members of the School Board, who are elected to represent the interests of the voters of Cobb County in governing the public school system. The movants may argue that they can better represent the interest of the voters of Cobb County in this action than the elected officials who are the plaintiffs, but the movants have

---

**38.** Furthermore, the Court notes that its own remedial plan also lowers the overall population deviation from that of the plaintiffs' proposed plan, from 4.86% to 2.90%, because courts are required to achieve the smallest population deviation as practicable when devising plans to remedy constitutional violations in existing apportionment schemes. See discussion of Court's remedial plans, supra.

failed to present sufficient evidence to support that contention.

Finally, even assuming that citizens at large who share the same goal as the governmental plaintiffs in a case should be allowed to present their own alternative plans, these particular intervenors have no interest to vindicate in a one-person, one-vote action. Specifically, the putative intervenors live in Post 7, which, under the existing plan, has a lower population than the ideal district. This fact means that the intervenors' vote is stronger than it should be were there absolute population equality among the districts. That being so, putative intervenors have no interest in trying to press a claim that their vote is too strong. Intervenors' effort is analogous to a resident of the rural part of South Georgia in the county unit days trying to intervene in a *Reynolds v. Sims* action on the ground that his vote is too strong as compared to the weaker vote of residents of the more populous Atlanta area.

Moreover, an examination of the two proposed plans reveals that plaintiffs are representing the purported interests of intervenors better than do the latter. Specifically, the plaintiffs' proposed plan leaves Post 7 with a –2.575 deviation, meaning that Post 7 is underpopulated by 2,013 vote and that its voters have a "stronger" vote than they are entitled to have. Intervenors' plan, however, calls for only a –.82% deviation, which means that they seek a weaker vote for themselves than do the plaintiffs, who they claim do not adequately represent their interest.[39]

In summary, the Court concludes that the putative intervenors have failed to demonstrate that their interests are not being adequately represented by the plaintiffs in this action, and the movants have not demonstrated any compelling reason to

grant their motion under a theory of permissive intervention. Accordingly, the Court **DENIES** Wilkerson and Bell's motion to intervene [7] as party-defendants in the *Smith* action. It **GRANTS** the Georgia Democratic Party's motion to appear as an *amicus curiae* [8], and it will also allow the putative intervenors to appear as *amici curiae.* The Court has considered the arguments of the amici in every aspect of this case.

### CONCLUSION

For all the reasons discussed above, the Court declares unconstitutional the existing apportionment plans for the electoral districts for the Cobb County Board of Education and the Cobb County Board of Commissioners and enjoins their use in the upcoming election and any future elections. On May 31, 2002, the Court issued an Order in which it established its own remedial, interim apportionment plans for both the Commission and the Board, which plans it attached to that Order. The Court emphasizes that its remedial plans apply only to the upcoming election.

Furthermore, as requested by the defendant Board of Elections, the Court **ORDERS** that the absentee voting date shall be moved to *July 15, 2002* in order to allow Board of Elections to implement the remedial plan with respect to absentee voters.

Finally, the Court directs the Georgia General Assembly to enact a plan redistricting the Cobb Commission and the Cobb School Board, by May 1, 2003. In the event that the General Assembly fails to fulfill its elected duty to do so, the Court will keep jurisdiction of this case, in order to hold a full trial on the matter, after which it will implement a final remedial plan. In the event that this case arrives back in its current posture—that

---

**39.** The Court notes that its own plan likewise achieves a greater negative value for Post 7——1.26%—than does intervenors.

is, consideration of the local plan by the full Senate has been apparently thwarted by persons who oppose the local plan—the Court will consider whether it should therefore adopt the recommended local plan, sending the latter to the Department of Justice to be considered for preclearance. *See McDaniel v. Sanchez,* 452 U.S. 130, 153 n. 35, 101 S.Ct. 2224, 68 L.Ed.2d 724 (in response to argument that an insistence on preclearance of unenacted plans will encourage dilatory tactics by those who seek to prevent redistricting, the Supreme Court noted that district courts have ample power to fashion remedies that avoid such problems).

The Court also **GRANTS** the motion to intervene [8] filed in the *Perry* case, but **DENIES** that same motion [7] in the *Smith* case. The Court **GRANTS** the motion to appear by the Democratic Party in the *Smith* and *Perry* case [8][9].

The Clerk is directed to **administratively close** this action. The action will be reopened if the Court is required to implement a final remedial plan.[40]

---

**40.** Plaintiffs in the Perry (School Board) action have requested **attorney's fees and costs.** If plaintiffs wish to pursue this request, they should file a motion in support thereof within **twenty (20) days** from the date of this Order.

**APPENDIX A**

Existing Cobb County Commission Districts

App. A-1

Plan Name: cobbcc94 Plan Type: Local User: Administrator: Cobb Co.

| DISTRICT | | POPULATION | DEVIATION | % DEVIATION | BLACK | % BLACK | BLACK COMBO | TOTAL BLACK | %TOTAL BLACK | HISP.OR LATINO | %HISP. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | | 191,889 | 39,951 | 26.29% | 26,966 | 14.05% | 1,058 | 28,024 | 14 60% | 12,829 | 6 69% |
| | VAP | 138,014 | | | 18,171 | 13 17% | 479 | 18,650 | 13 51% | 8,874 | 6 43% |
| 002 | | 138,530 | -13,408 | -8.82% | 29,186 | 21.07% | 1,097 | 30,283 | 21.86% | 13,140 | 9.49% |
| | VAP. | 112,011 | | | 21,767 | 19 43% | 634 | 22,401 | 20 00% | 9,552 | 8 53% |
| 003 | | 130,053 | -21,885 | -14.40% | 7,926 | 6.09% | 477 | 8,403 | 6.46% | 4,338 | 3 34% |
| | VAP | 92,922 | | | 5,404 | 5.82% | 202 | 5,606 | 6.03% | 2,925 | 3.15% |
| 004 | | 147,279 | -4,659 | -3.07% | 50,155 | 34.05% | 1,364 | 51,519 | 34.98% | 16,657 | 11.31% |
| | VAP | 106,398 | | | 32,442 | 30.49% | 618 | 33,060 | 31.07% | 11,016 | 10.35% |

Total Population: 607,751
Ideal Value: 151,938
Summary
Population Range: 130,053 to 191,889
Absolute Range: -21,885 to 39,951
Absolute Overall Range: 61,836
Relative Range: -14.40% to 26.29%
Relative Overall Range: 40 70%

App. A-2

**APPENDIX B**

Proposed Cobb County Commission Districts

Client: Cobb
Plan: cobbcc200
Type: Local

App. B-1

*Dark overlay line is existing Commission District lines*

Plan Name: cobbcc2001 Plan Type: Local User: Administrator: Cobb Co.

| DISTRICT | | POPULATION | DEVIATION | % DEVIATION | BLACK | % BLACK | BLACK COMBO | TOTAL BLACK | %TOTAL BLACK | HISP.OR LATINO | %HISP. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | | 150,642 | -1,296 | -0.85% | 23,210 | 15.41% | 922 | 24,132 | 16.02% | 11,242 | 7.46% |
| | VAP | 110,190 | | | 15,800 | 14.34% | 398 | 16,198 | 14.70% | 7,803 | 7.08% |
| 002 | | 152,673 | 735 | 0.48% | 34,987 | 22.92% | 1,280 | 36,267 | 23.75% | 17,364 | 11.37% |
| | VAP | 121,142 | | | 24,945 | 20.59% | 711 | 25,656 | 21.18% | 12,144 | 10.02% |
| 003 | | 153,953 | 2,015 | 1.33% | 17,268 | 11.22% | 821 | 18,089 | 11.75% | 10,221 | 6.64% |
| | VAP | 111,553 | | | 11,914 | 10.68% | 386 | 12,300 | 11.03% | 7,140 | 6.40% |
| 004 | | 150,483 | -1,455 | -0.96% | 38,768 | 25.76% | 973 | 39,741 | 26.41% | 8,137 | 5.41% |
| | VAP | 106,460 | | | 25,125 | 23.60% | 438 | 25,563 | 24.01% | 5,280 | 4.96% |

Total Population: 607,751
Ideal Value: 151,938
Summary
Population Range: 150,483 to 153,953
Absolute Range: -1,455 to 2,015
Absolute Overall Range: 3,470
Relative Range: -0.96% to 1.33%
Relative Overall Range: 2.28%

APPENDIX C

Proposed Cobb County Commission Districts

Client. Cobb
Plan: cobbccnew
Type: Local

App. C-1

*Dark overlay line is existing Commission District lines*

Plan Name: cobbccnew Plan Type: Local User: Administrator: Cobb Co.

| DISTRICT | POPULATION | DEVIATION | % DEVIATION | BLACK | % BLACK | BLACK COMBO | TOTAL BLACK | %TOTAL BLACK | HISP.OR LATINO | %HISP. |
|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 153,176 | 1,238 | 0.81% | 15,529 | 10.14% | 639 | 16,168 | 10.56% | 6,037 | 3.94% |
| VAP | 109,148 | | | 10,736 | 9.84% | 280 | 11,016 | 10 09% | 4,032 | 3.69% |
| 002 | 151,058 | -880 | -0.58% | 40,632 | 26.90% | 1,441 | 42,073 | 27.85% | 21,156 | 14.01% |
| VAP | 121,697 | | | 29,353 | 24.12% | 803 | 30,156 | 24.78% | 15,380 | 12.64% |
| 003 | 153,025 | 1,087 | 0.72% | 7,558 | 4.94% | 523 | 8,081 | 5.28% | 4,855 | 3.17% |
| VAP | 109,843 | | | 5,140 | 4.68% | 228 | 5,368 | 4.89% | 3,267 | 2.97% |
| 004 | 150,492 | -1,446 | -0.95% | 50,514 | 33 57% | 1,393 | 51,907 | 34.49% | 14,916 | 9.91% |
| VAP | 108,657 | | | 32,555 | 29.96% | 622 | 33,177 | 30 53% | 9,688 | 8.92% |

Total Population: 607,751
Ideal Value: 151,938

Summary

Population Range: 150,492 to 153,176
Absolute Range: -1,446 to 1,238
Absolute Overall Range: 2,684
Relative Range: -0.95% to 0.81%
Relative Overall Range: 1.77%

App. C-2

APPENDIX D

App. D-1

Plan Name: **FEDCTCOBBCC** Plan Type: **Local** User: **Linda** Administrator: **Cobb**

| DISTRICT | POPULATION | DEVIATION | % DEVIATION | BLACK | % BLACK | BLACK COMBO | TOTAL BLACK | %TOTAL BLACK | HISP.OR LATINO | %HISP. |
|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 152,843 | 905 | 0.60% | 19,474 | 12.74% | 730 | 20,204 | 13 22% | 9,411 | 6.16% |
| VAP | 109,455 | | | 13,251 | 12.11% | 327 | 13,578 | 12.41% | 6,493 | 5.93% |
| 002 | 150,548 | -1,390 | -0.91% | 30,519 | 20.27% | 1,158 | 31,677 | 21.04% | 13,738 | 9 13% |
| VAP | 121,109 | | | 22,744 | 18.78% | 659 | 23,403 | 19 32% | 9,986 | 8.25% |
| 003 | 151,878 | -60 | -0.04% | 11,919 | 7.85% | 673 | 12,592 | 8.29% | 6,811 | 4.48% |
| VAP | 108,769 | | | 7,957 | 7.32% | 302 | 8,259 | 7.59% | 4,649 | 4 27% |
| 004 | 152,482 | 544 | 0.36% | 52,321 | 34 31% | 1,435 | 53,756 | 35 25% | 17,004 | 11.15% |
| VAP | 110,012 | | | 33,832 | 30 75% | 645 | 34,477 | 31.34% | 11,239 | 10.22% |

Total Population: 607,751
Ideal Value 151,938
**Summary**
Population Range: 150,548 to 152,843
Absolute Range: -1,390 to 905
Absolute Overall Range 2,295
Relative Range: -0.91% to 0.60%
Relative Overall Range: 1 51%

**APPENDIX E**

## Comparison of Cobb County Commission Plans

| | | Existing | Plaintiffs | Intervenors | Court |
|---|---|---|---|---|---|
| District 1 | Total | 191,889 | 150,642 | 153,176 | 152,843 |
| | Dev | + 26.29% | − 0.85% | + 0.81% | + 0.60% |
| | BVAP | 13.51% | 14.70% | 10.09% | 12.41% |
| District 2 | Total | 138,530 | 152,673 | 151,058 | 150,548 |
| | Dev | − 8.82% | + 0.48% | − 0.58% | − 0.91% |
| | BVAP | 20.00% | 21.18% | 24.78% | 19.32% |
| District 3 | Tota | 130,053 | 153,953 | 153,025 | 151,878 |
| | Dev | − 14.40% | + 1.33% | + 0.72% | − 0.04% |
| | BVAP | 6.03% | 11.03% | 4.89% | 7.59% |
| District 4 | Total | 147,279 | 150,483 | 150,492 | 152,482 |
| | Dev | − 3.07% | − 0.96% | − 0.95% | + 0.36% |
| | BVAP | 31.07% | 24.01% | 30.53% | 31.34% |
| Total Dev. | | 40.70% | 2.28% | 1.77% | 1.51% |

Total = Total Population

Dev = Percentage Deviation from the Ideal District

BVAP = Percentage of Blacks in the Voting Age Population (total black and black/combo population)

1324

APPENDIX F

## Existing Cobb County School Board Districts

App. F-1

Plan Name: cobbsb99 Plan Type: **Local** User: Administrator: **Cobb Co.**

| DISTRICT | POPULATION | DEVIATION | % DEVIATION | BLACK | % BLACK | BLACK COMBO | TOTAL BLACK | %TOTAL BLACK | HISP. OR LATINO | %HISP. |
|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 115,152 | 36,591 | 46.58% | 13,287 | 11.54% | 518 | 13,805 | 11.99% | 4,016 | 3.49% |
| VAP | 79,297 | | | 8,633 | 10.89% | 205 | 8,838 | 11.15% | 2,549 | 3.21% |
| 002 | 73,792 | -4,769 | -6 07% | 17,808 | 24.13% | 556 | 18,364 | 24.89% | 6,808 | 9 23% |
| VAP. | 61,423 | | | 13,299 | 21.65% | 317 | 13,616 | 22.17% | 4,940 | 8.04% |
| 003 | 81,798 | 3,237 | 4.12% | 30,296 | 37.04% | 713 | 31,009 | 37.91% | 6,269 | 7 66% |
| VAP | 58,374 | | | 19,553 | 33 50% | 315 | 19,868 | 34.04% | 4,063 | 6 96% |
| 004 | 73,760 | -4,801 | -6.11% | 5,736 | 7.78% | 383 | 6,119 | 8.30% | 4,098 | 5.56% |
| VAP | 54,067 | | | 3,894 | 7.20% | 179 | 4,073 | 7.53% | 2,742 | 5.07% |
| 005 | 64,321 | -14,240 | -18.13% | 3,781 | 5.88% | 216 | 3,997 | 6.21% | 2,036 | 3.17% |
| VAP | 45,666 | | | 2,506 | 5.49% | 96 | 2,602 | 5.70% | 1,367 | 2.99% |
| 006 | 62,699 | -15,862 | -20.19% | 2,998 | 4.78% | 191 | 3,189 | 5.09% | 1,588 | 2 53% |
| VAP | 46,451 | | | 2,186 | 4.71% | 86 | 2,272 | 4.89% | 1,129 | 2.43% |
| 007 | 78,408 | -153 | -0.19% | 23,439 | 29.89% | 847 | 24,286 | 30.97% | 12,255 | 15.63% |
| VAP | 59,221 | | | 15,804 | 26.69% | 431 | 16,235 | 27.41% | 8,304 | 14.02% |

Total Population: 549,930
Ideal Value: 78,561
Summary
Population Range: 62,699 to 115,152
Absolute Range: -15,862 to 36,591
Absolute Overall Range: 52,453
Relative Range: -20.19% to 46.58%
Relative Overall Range: 66 77%

App. F-2

1326

APPENDIX G

## Proposed Cobb County School Board Districts

App. G-1

*Dark overlay line is existing
Commission District lines*

Plan Name: cobbsbp1 Plan Type: Local User: Administrator: Cobb Co.

| DISTRICT | | POPULATION | DEVIATION | % DEVIATION | BLACK | % BLACK | BLACK COMBO | TOTAL BLACK | %TOTAL BLACK | HISP.OR LATINO | %HISP. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | | 76,096 | -2,333 | -2.97% | 4,704 | 6.18% | 233 | 4,937 | 6.49% | 2,653 | 3 49% |
| | VAP | 52,367 | | | 3,016 | 5.76% | 80 | 3,096 | 5.91% | 1,676 | 3.20% |
| 002 | | 79,514 | 1,085 | 1.38% | 18,561 | 23.34% | 651 | 19,212 | 24.16% | 6,450 | 8 11% |
| | VAP | 65,891 | | | 13,762 | 20.89% | 359. | 14,121 | 21.43% | 4,653 | 7.06% |
| 003 | | 77,737 | -692 | -0 88% | 29,078 | 37.41% | 668 | 29,746 | 38.26% | 6,048 | 7.78% |
| | VAP | 55,584 | | | 18,768 | 33.77% | 300 | 19,068 | 34.30% | 3,928 | 7.07% |
| 004 | | 79,657 | 1,228 | 1.57% | 7,787 | 9.78% | 437 | 8,224 | 10.32% | 4,106 | 5.15% |
| | VAP | 57,670 | | | 5,273 | 9.14% | 203 | 5,476 | 9.50% | 2,760 | 4.79% |
| 005 | | 79,908 | 1,479 | 1.89% | 4,180 | 5.23% | 270 | 4,450 | 5.57% | 2,198 | 2.75% |
| | VAP | 56,564 | | | 2,820 | 4.99% | 123 | 2,943 | 5.20% | 1,464 | 2.59% |
| 006 | | 79,539 | 1,110 | 1.42% | 9,966 | 12.53% | 460 | 10,426 | 13.11% | 4,883 | 6.14% |
| | VAP | 60,405 | | | 7,055 | 11.68% | 244 | 7,299 | 12 08% | 3,458 | 5.72% |
| 007 | | 76,416 | -2,013 | -2.57% | 22,622 | 29.60% | 694 | 23,316 | 30.51% | 10,658 | 13.95% |
| | VAP | 55,185 | | | 14,860 | 26.93% | 314 | 15,174 | 27 50% | 7,102 | 12.87% |

Total Population: 548,867
Ideal Value: 78,429

**Summary**

Population Range: 76,096 to 79,908
Absolute Range: -2,333 to 1,479
Absolute Overall Range: 3,812
Relative Range: -2.97% to 1.89%
Relative Overall Range: 4.86%

App. G-2

1328

APPENDIX H

Proposed Cobb County School Board Districts

Client: Cobb
Plan: cobbsbne
Type: Local

App. H-1

Dark overlay line is existing
School Board District lines

Plan Name: cobbsbnew Plan Type: Local User: Administrator: Cobb Co.

| DISTRICT | | POPULATION | DEVIATION | % DEVIATION | BLACK | % BLACK | BLACK COMBO | TOTAL BLACK | %TOTAL BLACK | HISP.OR LATINO | %HISP. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | | 77,822 | -607 | -0.77% | 6,744 | 8.67% | 298 | 7,042 | 9.05% | 2,596 | 3.34% |
| | VAP | 53,484 | | | 4,441 | 8.30% | 127 | 4,568 | 8.54% | 1,672 | 3.13% |
| 002 | | 77,948 | -481 | -0.61% | 20,146 | 25.85% | 697 | 20,843 | 26.74% | 7,300 | 9.37% |
| | VAP | 65,222 | | | 15,093 | 23.14% | 412 | 15,505 | 23.77% | 5,343 | 8.19% |
| 003 | | 79,142 | 713 | 0.91% | 27,451 | 34.69% | 712 | 28,163 | 35.59% | 6,243 | 7.89% |
| | VAP | 57,212 | | | 17,847 | 31.19% | 321 | 18,168 | 31.76% | 4,089 | 7.15% |
| 004 | | 78,165 | -264 | -0.34% | 8,977 | 11.48% | 406 | 9,383 | 12.00% | 4,018 | 5.14% |
| | VAP | 57,434 | | | 6,331 | 11.02% | 190 | 6,521 | 11.35% | 2,720 | 4.74% |
| 005 | | 79,042 | 613 | 0.78% | 4,762 | 6.02% | 275 | 5,037 | 6.37% | 2,714 | 3.43% |
| | VAP | 56,119 | | | 3,152 | 5.62% | 117 | 3,269 | 5.83% | 1,799 | 3.21% |
| 006 | | 79,072 | 643 | 0.82% | 3,702 | 4.68% | 257 | 3,959 | 5.01% | 2,309 | 2.92% |
| | VAP | 57,970 | | | 2,599 | 4.48% | 113 | 2,712 | 4.68% | 1,598 | 2.76% |
| 007 | | 77,787 | -642 | -0.82% | 25,121 | 32 29% | 768 | 25,889 | 33.28% | 11,821 | 15.20% |
| | VAP | 56,295 | | | 16,093 | 28.59% | 343 | 16,436 | 29 20% | 7,824 | 13.90% |

Total Population: 548,978
Ideal Value: 78,429

Summary

Population Range: 77,787 to 79,142
Absolute Range: -642 to 713
Absolute Overall Range: 1,355
Relative Range: -0.82% to 0.91%
Relative Overall Range: 1.73%

App. H-2

**APPENDIX I**

Cobb County School Board Districts Drawn by Federal Court -- May 2002

App. I-1

Plan Name: FEDCTCOBBSB Plan Type: User: staff Administrator:

| DISTRICT | | POPULATION | DEVIATION | % DEVIATION | BLACK | % BLACK | BLACK COMBO | TOTAL BLACK | %TOTAL BLACK | HISP.OR LATINO | %HISP. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | | 78,253 | -176 | -0.22% | 4,954 | 6.33% | 242 | 5,196 | 6.64% | 2,772 | 3.54% |
| | VAP | 53,936 | | | 3,187 | 5.91% | 84 | 3,271 | 6.06% | 1,747 | 3.24% |
| 002 | | 78,349 | -80 | -0.10% | 19,423 | 24.79% | 653 | 20,076 | 25.62% | 7,562 | 9.65% |
| | VAP | 64,027 | | | 14,159 | 22.11% | 356 | 14,515 | 22.67% | 5,398 | 8.43% |
| 003 | | 77,737 | -692 | -0.88% | 29,078 | 37.41% | 668 | 29,746 | 38.26% | 6,048 | 7.78% |
| | VAP | 55,584 | | | 18,768 | 33.77% | 300 | 19,068 | 34.30% | 3,928 | 7.07% |
| 004 | | 79,716 | 1,287 | 1.64% | 7,751 | 9.72% | 443 | 8,194 | 10.28% | 4,044 | 5.07% |
| | VAP | 57,788 | | | 5,249 | 9.08% | 207 | 5,456 | 9.44% | 2,730 | 4.72% |
| 005 | | 77,803 | -626 | -0.80% | 3,971 | 5.10% | 255 | 4,226 | 5.43% | 2,146 | 2.76% |
| | VAP | 54,947 | | | 2,675 | 4.87% | 115 | 2,790 | 5.08% | 1,427 | 2.60% |
| 006 | | 79,704 | 1,275 | 1.63% | 8,981 | 11.27% | 453 | 9,434 | 11.84% | 3,729 | 4.68% |
| | VAP | 61,481 | | | 6,579 | 10.70% | 246 | 6,825 | 11.10% | 2,690 | 4.38% |
| 007 | | 77,441 | -988 | -1.26% | 22,745 | 29.37% | 699 | 23,444 | 30.27% | 10,716 | 13.84% |
| | VAP | 55,992 | | | 14,939 | 26.68% | 315 | 15,254 | 27.24% | 7,135 | 12.74% |

Total Population: 549,003
Ideal Value: 78,429
<u>Summary</u>
Population Range: 77,441 to 79,716
Absolute Range: -988 to 1,287
Absolute Overall Range: 2,275
Relative Range: -1.26% to 1.64%
Relative Overall Range: 2.90%

App. I-2

# APPENDIX J

## Comparison of Cobb County School Board Plans

| | | Existing | Plaintiffs | Intervenors | Court |
|---|---|---|---|---|---|
| Post 1 | Total | 115,152 | 76,096 | 77,822 | 78,253 |
| | Dev | + 46.58% | − 2.97% | − 0.77% | − 0.22% |
| | BVAP | 11.15% | 5.91% | 8.54% | 6.06% |
| Post 2 | Total | 73,792 | 79,514 | 77,948 | 78,349 |
| | Dev | − 6.07% | + 1.38% | − 0.61% | − 0.10% |

| | | | | | |
|---|---|---|---|---|---|
| | BVAP | 22.17% | 21.43% | 23.77% | 22.67% |
| Post 3 | Total | 81,798 | 77,737 | 79,142 | 77,737 |
| | Dev | + 4.12% | − 0.88% | + 0.91% | − 0.88% |
| | BVAP | 34.04% | 34.30% | 31.76% | 34.30% |
| Post 4 | Total | 73,760 | 79,657 | 78,165 | 79,716 |
| | Dev | − 6.11% | + 1.57% | − 0.34% | + 1.64% |
| | BVAP | 7.53% | 9.50% | 11.35% | 9.44% |
| Post 5 | Total | 64,321 | 79,908 | 79,042 | 77,803 |
| | Dev | − 18.13% | + 1.89% | + 0.78% | − 0.80% |
| | BVAP | 5.70% | 5.20% | 5.83% | 5.08% |
| Post 6 | Total | 62,699 | 79,539 | 79,072 | 79,704 |
| | Dev | − 20.19% | + 1.42% | + 0.82% | + 1.63% |
| | BVAP | 4.89% | 12.08% | 4.68% | 11.10% |
| Post 7 | Total | 78,408 | 76,416 | 77,787 | 77,441 |
| | Dev | − 0.19% | − 2.57% | − 0.82% | − 1.26% |
| | BVAP | 27.41% | 27.50% | 29.20% | 27.24% |
| Total Dev. | | 66.77% | 4.86% | 1.73% | 2.90% |

Total = Total Population
Dev = Percentage Deviation from the Ideal District
BVAP = Percentage of Blacks in the Voting Age Population (total black and black/combo population)